**REPUBLIC STEEL CORPORATION, Petitioner,**

v.

**Douglas M. COSTLE, Administrator, U. S. Environmental Protection Agency,**

**George R. Alexander, Jr., Regional Administrator, U. S. Environmental Protection Agency,**

**Ned E. Williams, Director, Ohio Environmental Protection Agency, Respondents.**

**No. 76–1557.**

United States Court of Appeals, Sixth Circuit.

Argued June 6, 1978.

Decided Aug. 21, 1978.

Rehearing Denied Sept. 20, 1978.

Eben H. Cockley, Ronald R. Janke, Jones, Day, Reavis & Pogue, Cleveland, Ohio, for petitioner.

Joan Z. Bernstein, Gen. Counsel, Barry L. Malter, Environmental Protection Agency, Washington, D. C., Thomas A. Pursley, III, Edward J. Shawaker, Dept. of Justice, Washington, D. C., for Environmental Protection Agency, E. Dennis Muchnicki, Columbus, Ohio, for Ohio Environmental Protection Agency.

George R. Alexander, Jr., pro se.

Before CELEBREZZE, LIVELY and KEITH, Circuit Judges.

CELEBREZZE, Circuit Judge.

This case is before the Court on remand from the Supreme Court for further consideration in light of the Clean Water Act of 1977, P.L. 95–217. In our previous decision we held that the Administrator of the United States Environmental Protection Agency (EPA) had improperly vetoed issuance of a water pollution permit to petitioner Republic Steel Corporation (Republic) for its Canton, Ohio, mill. *Republic Steel Corp. v. Train*, 557 F.2d 91 (6th Cir. 1977) (hereinafter referred to as *Republic Steel I*).[1] *Contra, United States Steel Corp. v. Train*, 556 F.2d 822, 854–55 (7th Cir. 1977).

The Administrator had objected to the permit, originally proposed by the Ohio Environmental Protection Agency (OEPA), on the ground that it improperly waived a July 1, 1977, statutory deadline for compliance with federal effluent standards. Under § 301(b)(1)(A)(i)[2] of the Federal Water Pollution Control Act as amended in 1972 (FWPCA) industrial dischargers were required to comply "not later than July 1, 1977" with "effluent limitations for point sources [requiring] the application of the best practicable control technology currently available, as defined by the Administrator pursuant to § 304(b)" of the Act. At the time of our previous decision EPA had not yet promulgated final regulations defining "best practicable technology currently available" (BPT) for categories of dischargers including iron and steel manufacturing, despite a requirement in § 304(b)(1)[3] of the Act that such regulations be published by October 18, 1973.[4]

We reluctantly concluded that EPA's failure to timely define BPT precluded the Administrator from imposing a July 1, 1977, compliance deadline, since Congress had apparently established promulgation of regulations under § 304(b) as a necessary precondition for imposition of the deadline in § 301(b)(1)(A)(i). Our decision was designed "to relieve the discharger of the unfair consequences" of being forced to comply with the deadline in the absence of applicable standards for guidance. 557 F.2d at 97.

This Court stayed its mandate in *Republic Steel I* pending the EPA's petition for a writ of certiorari from the Supreme Court. Shortly after EPA filed its petition for certiorari, Congress enacted the Clean Water Act of 1977, which substantially revised FWPCA. In the wake of that enactment, the Supreme Court granted EPA's petition, vacated our judgment in *Republic Steel I*, and remanded the case to this Court for

---

1. The case initially came before us on a petition for review of the Administrator's action, pursuant to § 509(b)(1)(F) of the Federal Water Pollution Act, 33 U.S.C. § 1369(b)(1)(F). The particular action submitted for review was a decision by the Administrator under § 402(d)(2)(B) of the Act to "object to," and thereby veto, issuance of a water pollution permit for the Canton mill as proposed by the Ohio Environmental Protection Agency. We note that the United States Court of Appeals for the Ninth Circuit has since ruled that § 509(b)(1)(F) does not convey jurisdiction on the courts of appeals to review permit vetoes by the Administrator under § 402(d)(2)(B). *Washington v. E. P. A.*, 573 F.2d 583, 586–87 (9th Cir. 1978). This Court has already ruled *contra*, however, *Ford Motor Co. v. E. P. A.*, 567 F.2d 661, 668 (6th Cir. 1977), and we adhere to our earlier view. *See also Mianus River Preservation Comm. v. Administrator, E. P. A.*, 541 F.2d 899, 909 (2d Cir. 1976).

2. 33 U.S.C. § 1311(b)(1)(A)(i).

3. 33 U.S.C. § 1314(b)(1).

4. As of oral argument in this case (June 1978), EPA had still not promulgated final BPT guidelines for iron and steel manufacturing. In the absence of general standards, BPT has been determined on a case-by-case basis, either by the Administrator or by the responsible state agency. *See, e. g.,* OEPA regulation EP–31–04(B)(1)(b) (1974).

further consideration in light of the new law. *Costle v. Republic Steel Corp.*, 434 U.S. 1030, 98 S.Ct. 761, 54 L.Ed.2d 778 (1978).

■ We have reviewed the 1977 Act and conclude that its provisions have effectively overruled our previous decision. Although neither § 301(b)(1)(A)(i), requiring industrial dischargers to achieve BPT no later than July 1, 1977, nor § 304(b), requiring EPA to define BPT by October 18, 1973, were amended by the 1977 Act, Congress did add a new § 309(a)(5)(B) [5] providing as follows:

> (B) The Administrator may, if he determines (i) that any person who is a violator of, or any person who is otherwise not in compliance with, the time requirements under this Act or in any permit issued under this Act, has acted in good faith, and has made a commitment (in the form of contracts or other securities) of necessary resources to achieve compliance by the earliest possible date after July 1, 1977, but not later than April 1, 1979; (ii) that any extension under this provision will not result in the imposition of any additional controls on any other point or nonpoint source; (iii) that an application for a permit under section 402 of this Act was filed for such person prior to December 31, 1974; and (iv) that the facilities necessary for compliance with such requirements are under construction, grant an extension of the date referred to in section 301(b)(1)(A) to a date which will achieve compliance at the earliest time possible but not later than April 1, 1979.

The legislative history of this provision makes it abundantly clear that Congress intended the procedure outlined therein to be the exclusive avenue of relief from the dictates of a mandatory and unconditional July 1, 1977, deadline. The Senate Report expressly rejected the rationale of *Republic Steel I* : [6]

Under existing law there are no circumstances that justify a time for compliance extending beyond July 1, 1977. The Administrator can only issue an enforcement order requiring compliance within 30 days or initiate civil or criminal action. Thus, the decision of the U.S. Court of Appeals for the Sixth Circuit in *Republic Steel Corporation v. Train et al.* and *Williams*, 557 F.2d 91, (6th Cir. 1977) was an incorrect interpretation of existing law. This amendment responds to the legitimate concern of dischargers who, despite good faith efforts, will not comply with the 1977 requirements. To accommodate this objective, the committee amended section 309(a) of the act to authorize the Administrator in his discretion, to pursue one of two new options with regard to a discharger out of compliance.

\*   \*   \*   \*   \*   \*

The committee believes that a case has been made in our hearings on this bill that some relief from penalties must be granted for those sources which have made a good faith attempt to comply with the deadlines in the statute but for justifiable reasons have been unable to do so. The committee considered but rejected the alternative of providing a case-by-case extension of the deadline set out in the statute. That alternative was rejected because the committee felt that such a case-by-case extension would not only burden the administrative process but that it would provide further opportunity for delay for those sources which are otherwise unable to make a legitimate case for additional time. Consequently, decisions by the Administrator pursuant to this new provision of law should not be the subject of administrative hearings and appeals but rather, if the Administrator feels he cannot determine that a source meets the requirements of section 309(a)(5)(B) that he will immediately proceed under any of the other enforcement options set out in section 309. This au-

---

**5.** 33 U.S.C. § 1319(a)(5)(B).

**6.** The Senate version of § 309(a)(5)(B) was adopted by the conference committee with only

minor revision. H.R.Rep. No. 95–830, 95th Cong. 1st Sess., reprinted in 1977 U.S.Code Cong. & Admin.News, pp. 4424, 4463.

thorization of limited flexibility granted to the Administrator will maintain the pressure for compliance while at the same time enabling the Administrator to use his discretion to grant any justifiable extension.

Sen.Rep. 95–370, 95th Cong., 1st Sess. reprinted in 1977 U.S.Code Cong. & Admin.News, pp. 4326, 4385, 4387.

The import of the statute is now plain: the July 1, 1977, deadline cannot be waived by the courts. To the extent that noncompliance occurs despite good faith efforts as defined in § 309(a)(5)(B), relief is available only via discretionary extension of the deadline by the Administrator.[7]

■ Republic urges that mere addition of a new remedial procedure does not change the operation of the rest of the Act as we construed it in *Republic Steel I.* We are bound, however, to read the amendment together with the original provisions of the Act "as parts of an integrated whole." *Markham v. Cabell*, 326 U.S. 404, 411, 66 S.Ct. 193, 90 L.Ed. 165 (1945). The unchanged sections and the amendment must generally be given "the most harmonious, comprehensive meaning possible" so that they do not conflict. *Clark v. Uebersee Finanz-Korp.*, 332 U.S. 480, 488, 68 S.Ct. 174, 92 L.Ed. 88 (1947). *See also* 1A Sutherland, Statutory Construction § 22.35 (1972). To insist on adherence to our earlier view would not only render § 309(a)(5)(B) largely meaningless, but also would defeat Congress' clearly expressed intent in enacting that section.

Moreover, the 1977 Act effectively responds to the concern we expressed in *Republic Steel I* that a discharger might suffer "unfair consequences" from EPA's failure to timely promulgate relevant BPT regulations. Under prior law the Administrator had no clear statutory authority to extend the July 1, 1977, deadline and a discharger could be subjected to liability without any consideration for the reasons for his noncompliance.[8] The new § 309(a)(5)(B) clearly permits the Administrator to extend the deadline where noncompliance was caused solely by the lack of BPT guidelines.[9]

7. OEPA, which supported Republic's petition in *Republic Steel I,* now takes the position that the 1977 Act requires that we uphold EPA's position.

8. Prior to the 1977 Act, EPA did provide relief from the 1977 deadline on an informal basis. Under the "Enforcement Compliance Schedule Letter" (ECSL) program, the Administrator would agree to refrain from enforcement of the statutory deadline against certain dischargers who made good faith attempts at compliance. *See Bethlehem Steel Corp. v. Train,* 544 F.2d 657, 659–60 (3d Cir. 1976), *cert. den.,* 430 U.S. 975, 97 S.Ct. 1666, 52 L.Ed.2d 369 (1977).

9. The Senate Report indicates that § 309(a)(5)(B) was directed, in part, at dischargers whose noncompliance was caused by their inability to ascertain applicable standards, despite good faith attempts:

The limited discretion granted to the Administrator by section 309(a)(5)(B) may only be exercised where the Administrator is able to determine that a discharger acted in good faith. The term "good faith" is generally understood to mean a reasonable attempt to comply with the mandates of law. *Did the discharger attempt to determine what the applicable requirements were?* When the required technology was generally known in the industry, but the discharger had some legitimate disagreements with the Agency on other points, did the discharger begin on an abatement program or conversely did the discharger delay the abatement program pending the outcome of lengthy administrative procedures? When the required technology was the subject of a legitimate dispute with the Agency, did the discharger take all other measures that it was capable of (such as segregating waste streams, necessary site preparation, and outfall construction) or did it delay these practices pending the outcome of lengthy administrative procedures?

S.Rep. 95–370, 95th Cong., 1st Session, 1977 U.S.Code Cong. & Admin.News, pp. 4326, 4386 (emphasis supplied).

The Ninth Circuit recently held that the Administrator could not veto a proposed permit for failure to require attainment of BPT by the discharger, where the Administrator had not yet promulgated applicable BPT guidelines. *Washington v. EPA,* 573 F.2d 583, 589–92 (9th Cir. 1978). The case is distinguishable in that here the Administrator did not object to the substantive effluent limitations in the proposed permit for the Canton mill—the objection related solely to the compliance schedule. In any event, the Ninth Circuit holding failed to consider the possible impact of the 1977 Act on the Administrator's veto power under § 402(d)(2)(B).

■ We conclude, then, that the Administrator can properly object under § 402(d)(2)(B) of the Act to a proposed permit for a point source governed by § 301(b)(1)(A)(i) if that permit does not require attainment of BPT by July 1, 1977, unless the Administrator has determined that a time extension is warranted pursuant to § 309(a)(5)(B).

This does not, however, end our inquiry. We must decide whether the 1977 Act may be applied in the context of this case, which was pending before the Supreme Court at the time the new law took effect.

■ The general rule is that "a court is to apply the law in effect at the time of its decision, unless doing so would result in manifest injustice or there is statutory direction or legislative history to the contrary." *Bradley v. Richmond School Board,* 416 U.S. 696, 711, 94 S.Ct. 2006, 2016, 40 L.Ed.2d 476 (1974). This principle applies with full force to an appellate court in reconsidering a decision that has been vacated and remanded by the Supreme Court in light of an intervening change in the law. *See Fruehauf Corp. v. Internal Revenue Service,* 566 F.2d 574, 577–79 (6th Cir. 1977).

■ The Clean Water Act of 1977 contains no "statutory direction or legislative history" militating against application of § 309(a)(5)(B) to pending cases.[10] To the contrary, the statute is applicable to "any person who *is* a violator of, or any person who *is* otherwise not in compliance with, the time requirements" of the Act. § 309(a)(5)(B) (emphasis supplied). Moreover, the Senate Report indicates that the § 309 procedure was intended to "codify" the informal EPA practice already in existence, under which the Administrator stood firm behind the 1977 deadline, but delayed enforcement where the discharger showed the requisite good faith efforts at compliance.[11] *See* Sen.Rep. No. 95–370, 95th Cong., 1st Sess., reprinted in 1977 U.S.Code Cong. & Admin.News, pp. 4326, 4386. The Conference Report likewise indicates that under the 1977 Act "the existing enforcement policy of the EPA is continued." H.R. Rep. No. 95–830, 95th Cong., 1st Sess., reprinted in 1977 U.S.Code Cong. & Admin. News, pp. 4424, 4464.

Nor do we think that application of current law would result in manifest injustice. If Republic has made good faith efforts at compliance with the law that have been delayed only by EPA's failure to timely promulgate BPT standards, then the company will be eligible for an extension under § 309(a)(5)(B).[12] There is nothing fundamentally unfair in predicating relief from the deadline on a showing to the responsible agency that the polluter has made a "reasonable attempt to comply with the mandates of the law." Sen.Rep. No. 95–370, 95th Cong., 1st Sess., reprinted in 1977 U.S. Code Cong. & Admin.News, pp. 4326, 4386. Indeed, to require anything less would work an injustice on the overwhelming majority of the nation's major industrial dischargers who followed the law as best they could and

---

**10.** The conference report contains language regarding "existing administrative and court orders":

> It is the intent of the conferees that under the provision which allows the Administrator to establish a reasonable time in which to comply with an enforcement order, existing administrative and court orders which provide for attainment dates beyond April 1, 1979, continue in effect unless modified under these amendments. Therefore, the existing enforcement policy of the EPA is continued.

H.R.Rep. No. 95–830, 95th Cong., 1st Sess., reprinted in 1977 U.S.Code Cong. & Admin. News, pp. 4424, 4464.

This language has no application to the instant case, since there are no "existing" administrative or court orders providing for attainment dates beyond April 1, 1979, for the Canton mill.

**11.** *See* note 8, *supra.*

**12.** We assume, as we must, that the Administrator will make the necessary determination with regularity and fairness. *See United States v. Morgan,* 313 U.S. 409, 421, 61 S.Ct. 999, 85 L.Ed. 1429 (1941); *United States v. Chemical Foundation,* 272 U.S. 1, 14–15, 47 S.Ct. 1, 71 L.Ed. 131 (1926); K. C. Davis, Administrative Law Treatise § 11.06. *Cf. Withrow v. Larkin,* 421 U.S. 35, 47, 55, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975).

met the statutory timetable.[13] It would also flaunt the national commitment to attainment of water quality capable of supporting fish, wildlife and recreation by 1983, and the total elimination of pollutant discharges by 1985. 33 U.S.C. § 1251(a)(1) & (2). Application of current law is particularly favored where such matters of great national concern are at stake. *Bradley, supra,* 416 U.S. at 719–20, 94 S.Ct. 2006.

The situation might be different if Republic could claim that its noncompliance was induced by administrative or judicial construction of § 301(b)(1)(A)(i) to the effect that the July 1, 1977, deadline was waived by EPA's failure to promulgate BPT guidelines. *See generally United States v. Pennsylvania Ind. Chem. Corp.,* 411 U.S. 655, 670–75, 93 S.Ct. 1804, 36 L.Ed.2d 567 (1973). But in the years following enactment of FWPCA, EPA consistently took the official position that the statutory compliance date was absolute and that it was not waived by the absence of BPT guidelines.[14] The first draft permit for the Canton mill issued by OEPA in June 1974 required compliance by September 1976. EPA's position as to the Act's time

requirement was not challenged by a court of appeals until our decision in *Republic Steel I* on June 23, 1977—only days before the July 1, 1977, deadline.[15] Republic can hardly claim that its noncompliance was induced by that decision, since by even the most conservative estimates the necessary equipment would take many months to construct.[16] Nor can the company maintain that it ever had a vested right in the result ordered in *Republic Steel I,* since our mandate there never took effect, and since the Supreme Court later vacated the judgment altogether. *Cf. Bradley, supra,* 416 U.S. at 720, 94 S.Ct. 2006.

In any event, Republic does not seriously claim that its noncompliance with the July 1, 1977, deadline is the result of an honest belief that the deadline was invalid. Rather the company maintains that it was unable to meet the deadline despite good faith efforts, because of the absence of BPT guidelines from EPA. If this is true, then the new § 309(a)(5)(B) procedure can provide any justified relief.[17]

The petition for review is dismissed.

---

**13.** According to the Senate Report, ninety percent of the nation's major industrial dischargers were expected to meet the 1977 deadline. Sen.Rep. No. 95–370, 95th Cong. 1st Sess., reprinted in 1977 U.S.Code Cong. & Admin. News, pp. 4326, 4333.

**14.** *See, e. g.,* United States Environmental Protection Agency, Decision of the General Counsel # 4, in 1 Decisions of the Administrator and Decisions of the General Counsel [hereinafter "DGC"] 177, 181 (4–4–75), *aff'd,* Decision of the Administrator # 75–5, 1 DGC 136, 144 (12–5–75); Decision of the General Counsel # 11, 1 DGC 209, 210–11 (5–7–75); Decision of the General Counsel # 23, 1 DGC 305, 314 (7–3–75); Decision of the General Counsel # 26, 1 DGC 327, 328, 330–31 (7–24–75), *aff'd* Decision of the Administrator # 75–9, 1 DGC 106, 108–09 (9–30–75); Decision of the General Counsel # 45, 2 DGC 230, 232–36, *aff'd,* Decision of the Administrator # 75–10, 2 DGC 27 (8–10–76).

 *See also United States Steel Corp. v. Train,* 556 F.2d 822, 853–55 (7th Cir. 1977); *Bethlehem Steel Corp. v. Train,* 544 F.2d 657, 660 (3d Cir. 1976); 40 C.F.R. § 125.11(c) (promulgated 5–22–73).

**15.** Similar considerations would preclude any possible applicability of the ex post facto

clause to this case. The existence of the July 1, 1977, deadline, as construed by EPA was an "operative fact" sufficient to provide fair warning to Republic. *Dobbert v. Florida,* 432 U.S. 282, 297–98, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977).

**16.** The same rationale precludes any claim that noncompliance with the deadline was induced by OEPA's agreement to a 42 month compliance schedule in the fall of 1975. Republic concedes that its duty to commence compliance measures attached prior to that agreement. *See Republic Steel I,* 557 F.2d at 94.

**17.** We do not mean to suggest that Republic may in any sense be *entitled* to an extension as a matter of law. The decision on whether or not to grant an extension is committed to the Administrator's discretion, based on his assessment of the factors listed in § 309(a)(5)(B). Sen.Rep. No. 95–370, 95th Cong., 1st Sess., reprinted in 1977 U.S.Code Cong. & Admin. News, pp. 4326, 4386–87. *See* Quarles, *Impact of the 1977 Clean Water Act Amendments on Industrial Dischargers,* Env.Rep.Monograph No. 25 at 2 (1978). *See generally Vermont Yankee Nuclear Power Corp. v. NRDC,* 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978).