**CROWN SIMPSON PULP COMPANY,**
Petitioner,

v.

**Douglas M. COSTLE (formerly Russell E. Train), As Administrator, Environmental Protection Agency, Respondent.**

**LOUISIANA–PACIFIC CORPORATION,**
Petitioner,

v.

**Douglas M. COSTLE (formerly Russell E. Train), As Administrator, Environmental Protection Agency, Respondent.**

**CROWN SIMPSON PULP COMPANY and Louisiana-Pacific Corporation,**
Petitioners,

v.

**Douglas M. COSTLE, As Administrator, Environmental Protection Agency, Respondent.**

Nos. 76–3161, 76–3287 and 77–3322.

United States Court of Appeals, Ninth Circuit.

June 29, 1979.

W. Reece Bader (argued) of Orrick, Herrington, Rowley & Sutcliffe, Joseph A. Darrell, Paul R. Haerle of Thelen, Marrin, Johnson & Bridges, San Francisco, Cal., for petitioners.

James W. Moorman, Asst. Atty. Gen., Pollution Control Sec., Dept. of Justice, James A. Rogers (argued), Environmental Protection Agency, Washington, D. C., for respondent.

Kenneth S. Kamlet, National Wildlife Federation, Washington, D. C., on brief for amicus curiae.

Before DUNIWAY and CHOY, Circuit Judges, and RENFREW,* District Judge.

DUNIWAY, Circuit Judge:

Petitioners Crown Simpson Pulp Company and Louisiana-Pacific Corporation peti-

* The Honorable Charles B. Renfrew, United States District Judge for the Northern District of California, sitting by designation.

tion for review of respondent Administrator's action in vetoing pollutant discharge permits that the California State Water Resources Control Board proposed to issue to petitioners pursuant to § 402(b) of the Federal Water Pollution Control Act Amendments of 1972 ("the Act"), 33 U.S.C. § 1342(b). (Unless otherwise indicated, all citations to statutory sections are to sections of the Act as they appear in 33 U.S.C.) We dismiss the petitions for lack of jurisdiction.

## I. *Background.*

Petitioners operate two bleached kraft pulp mills located on the Pacific coast near Eureka, California, and those mills discharge pollutants into the Pacific Ocean.

Acting pursuant to § 1311, the Administrator of the United States Environmental Protection Agency ("the EPA") has promulgated revised nationally applicable regulations limiting the amounts of pollutants that different types of bleached kraft pulp, paper, and paperboard mills may discharge into navigable waters. See 40 C.F.R. part. 430, subparts F–I. His authority to issue such regulations was upheld by the Supreme Court in *E. I. du Pont de Nemours & Co. v. Train*, 1977, 430 U.S. 112, 136, 97 S.Ct. 965, 51 L.Ed.2d 204. *See also Weyerhaeuser Co. v. Costle*, 1978, 191 U.S.App.D.C. 309, 590 F.2d 1011. The regulations provide that a discharger may obtain a variance from these effluent limitations if it can show that

> factors relating to the equipment or facilities involved, the process applied, or other such factors related to such discharger are fundamentally different from the factors considered in the establishment of the guidelines.

*See, e. g.*, 40 C.F.R. §§ 430.62, 430.72, 430.-82, 430.92.

The EPA uses a permit system to enforce the effluent limitations. An industrial discharger must obtain a National Pollutant Discharge Elimination System permit if it wishes to continue releasing pollutants into navigable waters. *See* § 1342; *Shell Oil Co. v. Train*, 9 Cir., 1978, 585 F.2d 408, 410. It can obtain a permit only if it either can comply with the national effluent limitations or get a variance.

In some states, the EPA itself approves all permit applications. *See* § 1342(a). In other states, such as California, the EPA shares its permit granting authority with state officials pursuant to § 1342(b). In such states, state officials initially review a discharger's permit application. If they believe that an applicant qualifies, they notify the Administrator of the EPA that they propose to issue a permit. *See* § 1342(d)(1). The state officials may then issue the permit unless the Administrator objects in writing within ninety days on the ground that the permit falls "outside the guidelines and requirements of . . . Chapter [26]," the "Water Pollution Prevention and Control" portion of the Act. *See* § 1342(d)(2). This power to object in writing gives the EPA Administrator a power to veto permits that state officials propose to issue. *See E. I. du Pont de Nemours & Co. v. Train, supra*, 430 U.S. at 119, n. 7, 97 S.Ct. 965; *State of Washington v. United States Environmental Protection Agency, (Scott Paper)*, 9 Cir., 1978, 573 F.2d 583, 586; *Shell Oil Co. v. Train, supra*, 585 F.2d at 410. If a state does not resubmit an objected to permit, "revised to meet such objection", within certain time limits, the Administrator may himself issue a permit under § 1342(a), as if the applicant operated in a state which had not been authorized to issue permits. *See* § 1342(d)(4).

In these cases, the California Regional Water Resources Board, North Coast Region, first proposed to issue permits to petitioners on August 26, 1976. The permit did not follow the EPA's national effluent limitations. On September 3, 1976, the Director of EPA's Region IX Enforcement Division [1] vetoed the permits because they did not require petitioners to achieve "ef-

---

1. The Administrator delegated his veto power to his regional administrators and directors of enforcement pursuant to 40 C.F.R. §§ 125.-5(a)(4) and 125.5(c). *See Scott Paper, supra*, 573 F.2d at 585, n. 3. In this opinion, we treat their actions as the Administrator's.

fluent limitations based upon [the] best practicable control technology currently available" as required by § 1311(b)(1)(A). Petitioners then sought direct review of the Director's veto in this court in Nos. 76–3161 and 76–3287.

On March 17, 1977, the California State Water Resources Control Board ("the Board") granted the requested variances subject to the approval of the Administrator, and proposed to issue permits based upon those variances. The proposed permits would have allowed the companies to discharge wastes far in excess of the national effluent limitations. On September 15, 1977, the EPA Administrator vetoed the permits because they excused the companies from using the "best practicable control technology currently available" as required by the Act. In the EPA's view, this deficiency placed the permits "outside the guidelines and requirements of [the Act]" within the meaning of § 1342(d)(2). The Administrator's decision is reported as *In re Louisiana-Pacific*, 1977, 10 E.R.C. 1841. Crown Simpson and Louisiana-Pacific then petitioned this court in No. 77–3322 to overturn the Administrator's refusal to approve the state proposed variances.

## II. *Jurisdiction.*

Petitioners argue that we have jurisdiction under either subsection (E) or subsection (F) of § 1369(b)(1). The EPA does not argue for jurisdiction under subsection (F), but joins Petitioners in urging us to find jurisdiction under subsection (E). We conclude that we cannot exercise jurisdiction under either subsection (E) or subsection (F), and we dismiss the petitions for lack of jurisdiction.

Section 1369(b)(1) specifies the six circumstances under which "Review of the

Administrator's action . . . may be had . . . in the Circuit Court of Appeals. . . ." Two of them are
action . . .
(E) in approving or promulgating any effluent limitation or other limitation under section 1311, 1312, or 1316 of this title, and (F) in issuing or denying any permit under section 1342 of this title
. . . .

As we noted in *Pacific Legal Foundation v. Costle*, 9 Cir., 1978, 586 F.2d 650, 654, the courts of appeals have "strictly construed" these direct review provisions.

### A. *Subsection (E).*

Subsection (E) applies to an "[action] in approving or promulgating any effluent limitation or other limitation under section 1311, 1312, or 1316." These requirements are not satisfied here.

The Administrator did not "approve" or "promulgate" anything. Instead, he *rejected* a permit proposed by the California Board. And his action was with respect to a permit based upon a questionable variance, not an approval or promulgation of an effluent limitation or other limitation.

Petitioners advance two basic arguments. First, they say that the two vetoes are the functional equivalent of a newly promulgated, generalized regulation governing the granting of variances, and that if the Administrator had formally promulgated such a generalized variance regulation, it would have been directly reviewable by the court of appeals as an "effluent limitation or other limitation" under subsection (E). We can agree that a generalized variance regulation would be an "effluent limitation or other limitation" within the meaning of subsection (E) and thus be directly reviewable in the court of appeals.[2] *See Natural*

---

**2.** The variance clause set forth in the regulations is a reviewable effluent limitation. In fact, petitioner Crown Simpson filed a timely application with this court pursuant to subsection (E), to set aside the pulp industry effluent limitation regulations including the variance clause whose application is at issue here. That generalized challenge to the regulations was eventually transferred to the District of Colum-

bia Circuit which upheld the regulations, including the variance clause. *See Weyerhaeuser Co. v. Costle, supra*, 191 U.S.App.D.C. at 320, 329–339, 590 F.2d at 1022, 1031–1041. *Weyerhaeuser* left open the possibility of a subsequent challenge to the variance clause as applied. 590 F.2d at 1033, n. 29. We agree that an applicant may raise a challenge to a variance regulation as applied as part of a

*Resources Defense Council, Inc. v. E.P.A.,* 2 Cir., 1976, 537 F.2d 642, 644–45. We cannot, however, accept the premise that the Administrator's vetoing of the two permits was tantamount to the promulgation of a new variance regulation.

We have before us not the establishment of new regulations through an irregular procedure, but simply two individualized adjudications to determine the proper application of already promulgated effluent limitation regulations covering the entire industry. As such, the individualized adjudications are directly reviewable, if at all, only under subsection (F) which provides for direct review of Administrator action granting or denying individual permits.

Recent cases involving EPA Water Pollution Control Act regulations illustrate this dichotomy. Where polluters have challenged the validity of regulations, the Supreme Court and the courts of appeals have based jurisdiction upon subsection (E). *See, e. g., E. I. du Pont de Nemours v. Train, supra,* 430 U.S. at 115, 124–25, 136, 97 S.Ct. 965; *Virginia Electric & Power Co. v. Costle,* 4 Cir., 1977, 566 F.2d 446, 447, 449–50; *American Paper Inst. v. Train,* 1976, 177 U.S.App.D.C. 181, 189–90, 543 F.2d 328, 336–37; *American Petroleum Inst. v. E.P.A.,* 10 Cir., 1976, 540 F.2d 1023, 1026; *Natural Resources Defense Council, Inc. v. E.P.A., supra,* 537 F.2d at 645; *Hooker Chemicals & Plastics Corp. v. Train,* 2 Cir., 1976, 537 F.2d 620, 622, 624, 628; *American Meat Institute v. E.P.A.,* 7 Cir., 1975, 526 F.2d 442, 444, 452; *American Petroleum Inst. v. Train,* 10 Cir., 1975, 526 F.2d 1343, 1345. In contrast, where permit applicants have challenged individual applications of EPA regulations, the courts of appeals have looked to subsection (F) as the possible jur-

isdictional basis for direct review. *See, e. g., Republic Steel Corp. v. Costle,* 6 Cir., 1978, 581 F.2d 1228, 1230, n. 1; *Ford Motor Co. v. E.P.A.,* 6 Cir., 1977, 567 F.2d 661, 668; *Bethlehem Steel Corp. v. Train,* 3 Cir., 1976, 544 F.2d 657, 660; *Sun Enterprises, Ltd. v. Train,* 2 Cir., 1976, 532 F.2d 280, 284, 287. *See also Diamond Shamrock Corp. v. Costle,* 1978, 188 U.S.App.D.C. 407, 410, 580 F.2d 670, 673; *American Petroleum Inst. v. E.P.A., supra,* 540 F.2d at 1026, 1030, 1033. It is true that the vetoes provide a basis for predicting whether the Administrator will veto similar permits in future cases, but almost all administrative decisions have a generalized prospective effect to this extent.

Petitioners also argue that when the Administrator exercised his veto power he did not merely reject a permit because of a dubious variance, but rejected an "effluent limitation" within the meaning of subsection (E). Petitioners rely upon the variance clause in the regulation to convince us that we should equate state granted permits based upon variances with subsection (E) effluent limitations. The clause states:

> On the basis of such evidence or other available information, the Regional Administrator (or the State) will make a written finding that such factors are or are not fundamentally different for that facility compared to those specified in the Development Document. If such factors are found to exist, the Regional Administrator or the State *shall establish* for the discharger *effluent limitations in the NPDES permit* either more or less stringent than the limitations established herein to the extent dictated by such fundamentally different factors. 40 C.F.R. § 430.72 (emphasis added).[3]

petition to review an Administrator's veto of a permit based upon a proposed but rejected variance. However, we hold, *infra,* that veto of a state permit is not directly reviewable in this court, but rather is reviewable in the district court. Thus a challenge to a variance regulation as applied in such a case must await a properly brought action in the district court challenging the veto of the permit which contained the variance.

**3.** The variance clause also provides that Such limitations must be approved by the Administrator of the Environmental Protection Agency. The Administrator may approve or disapprove such limitations, *specify other limitations* or initiate proceedings to revise these regulations. (emphasis added)

Here, the Administrator has not taken the initiative to "specify other limitations" by himself

While the regulation does appear to support petitioners' argument, we cannot accept their analysis for two reasons. First, even if a permit based upon a variance amounted to a subsection (E) "effluent limitation," subsection (E) requires "administrator's action . . . approving or promulgating" an effluent limitation. Here the Administrator *rejected* the alleged effluent limitation.

■ Second, despite the isolated language of the regulation, a permit based upon a variance is simply not an "effluent limitation or other limitation under section 1311, 1312, or 1316" within the meaning of subsection (E). A variance does serve to limit the discharge of effluents. However, the phrase "effluent limitation . . . under section 1311, 1312 or 1316" is a term of art in the context of the Federal Water Pollution Control Act Amendments. Such an effluent limitation is a set of standards restricting the quantities of pollutants that enterprises in a given industry may discharge. *See, e. g., E. I. du Pont de Nemours & Co. v. Train, supra,* 430 U.S. 112, 126–137, 97 S.Ct. 965, 51 L.Ed.2d 204; *Scott Paper, supra,* 573 F.2d at 591–92; *Natural Resources Defense Council, Inc. v. E.P.A., supra,* 537 F.2d at 645; S.Rep.No.92–414, 92d Cong., 1st Sess. 50–51 (1971), U.S.Code Cong. & Admin.News 1972, p. 3668 reprinted in Senate Committee on Public Works, *A Legislative History of the Water Pollution Control Act Amendments of 1972,* 93d Cong., 1st Sess. 1468–1469 (1973) (hereafter "Leg. Hist."). Most factories and other point sources within a sub-category of an industry employ similar industrial processes, and so are generally able to limit their discharges to amounts which fall within those effluent limitations by adopting the best practically available pollution control technology. As the Supreme Court phrased it in *E. I. du Pont de Nemours & Co. v. Train, supra,* effluent limitations are sets of "regulations setting forth uniform effluent limitations for categories of plants." 430 U.S. at 136, 97 S.Ct. at 979.

Because such generalized effluent limitations may affect dozens or even hundreds of plants, it is understandable that Congress made the approval or promulgation of such effluent limitations directly reviewable in the courts of appeals. *See Virginia Electric & Power Co. v. Costle, supra,* 566 F.2d at 451. The two permits and variances at issue here have no similarly far reaching implications. Petitioners themselves assert that their two mills are the only bleached kraft pulp mills in the United States which discharge into open ocean waters, and argue that the proposed variances are valid for that reason. Petitioners' brief at 9.

In arguing that the rejections of the proposed variances did establish effluent limitations, petitioners correctly point out that the Administrator in part derives his power to approve and reject state proposed variances from his own implied authority to issue variances from the 1977 as well as the 1983 effluent limitations. His authority to issue variances from the 1977 limitations in turn is based in part upon his authority to promulgate effluent guidelines and limitations pursuant to sections 1311 and 1314. *See du Pont, supra,* 430 U.S. at 128, 97 S.Ct. 965; *Weyerhaeuser, supra,* 590 F.2d at 1031–1032.

■ Nevertheless, the fact that the Administrator's power to reject state proposed variances ultimately derives in part from his power to promulgate effluent limitations does not transform his rejection of state proposed variances for particular plants into the promulgation of effluent limitations. Subsection (E) provides for direct review of the promulgation of effluent limitations, not for direct review of all of the Administrator's actions that may in any way be dependent upon the Administrator's power to promulgate such limitations.

The very idea of a variance also cuts against treating a permit based on a variance as establishing a new effluent limitation rather than simply an exception to an

granting a less lenient variance. We thus need not decide whether the direct granting of such an alternative variance would be directly re-

viewable under subsection (E) as a limitation pursuant to § 1311(c).

existing limitation. In another context, the District of Columbia Circuit broadly analogized one of the Act's variance provisions to the variance clauses typically contained in local zoning ordinances. *See . Weyerhaeuser, supra,* 590 F.2d at 1034, n. 31. When a town board grants an individual zoning variance, that does not mean that it establishes a new zoning ordinance. When an effluent permit issuing authority grants a variance, it does no more than vary the application of an otherwise uniform effluent limitation.

Because the Administrator has not here promulgated or approved any effluent limitation or other limitation under § 1311, § 1312, or § 1316, direct review is not available in this court pursuant to subsection (E) of § 1369(b)(1).[4] *But cf. Weyerhaeuser v. Costle, supra,* 590 F.2d at 1033, n. 29.

B. *Subsection (F).*

██ Subsection (F) of § 1369(b)(1) provides for direct review in the courts of appeals of an EPA Administrator's action "in issuing or denying any permit under Section 1342 of this title . . . ." In states where the EPA itself grants all permits, subsection (F) unquestionably provides for direct review. However, petitioners operate their mills in California, and as we have seen, California has received the Administrator's approval to administer its own permit issuance program pursuant to § 1342(b). That provision thus limited the Administrator's role in this case to vetoing the permit by objecting to it in writing within the ninety days, or doing nothing for ninety days, in which case the state could proceed to issue the permit, or waiving the ninety-day objection period, thus enabling the state to issue the permit immediately. *See* § 1342(d)(3).

In the cases at bar, the Administrator took the position that all variances required his express approval. He then refused to approve the state proposed variances on their merits, and consequently objected to the permits. Petitioners argue that the Administrator's course of conduct thus constituted "action . . . denying [a] permit" within the meaning of subsection (F), because his actions prevented the state from issuing the permits. In *Scott Paper, supra,* we rejected precisely this argument. There, the Administrator vetoed a discharge permit issued to another pulp and paper company by a Washington state agency because the permit did not require the "best practicable control technology currently available," 573 F.2d at 587. Like the California Board, the Washington state agency had been authorized to administer the permit granting program for the state of Washington pursuant to § 1342(b). On the basis of the "clear and unmistakable" language of the statute, 573 F.2d at 587, we held that subsection (F) "is limited to the Administrator and to his own action in issuing or denying a permit, not to his objection to a state's action in doing so." 573 F.2d at 586. We held that the Administrator's limited involvement did not give rise to an agency relationship sufficient to bring the Administrator's actions within the "issuing or denying" clause of subsection (F). *Ibid; Accord, Shell Oil Co. v. Train, supra,* 583 F.2d at 412. Our *Scott Paper* decision is directly in point, and controls our decision

---

**4.** We are aware that the language of the second paragraph of Part II of the Supreme Court's opinion in *du Pont, supra,* may suggest that if the Administrator grants or *denies* a variance under § 1311(c), his action is reviewable in the court of appeals under subsection (E), as the "approving or promulgating [of an] . . . other limitation under section 301 . . . ." *See* 430 U.S. at 136, 97 S.Ct. at 979. In Part II (B) of this opinion, *infra,* we explain why we do not equate an Administrator's action in vetoing or failing to object to a state proposed permit with the Administrator's grant or denial of a permit within the meaning of § 1369(b)(1)(F). For the same reasons, we would not equate an Administrator's action in approving, rejecting, or failing to object to a state proposed variance with granting or denying a variance within the meaning of § 1311(c). In the absence of any direct granting or denying under § 1311(c), the possible reviewability of the Administrator's action under that section cannot provide us with subsection (E) jurisdiction to reach the merits. *But see Shell Oil Co. v. Train, supra,* 585 F.2d at 412 (*dictum*). In any event, § 1311(c) only applies to permit applications "filed after July 1, 1977." Petitioners' applications were filed with the California State Water Resources Control Board in 1976.

here, and we hold that we do not have jurisdiction to review the Administrator's action pursuant to § 1369(b)(1). *Cf. also Save the Bay, Inc. v. Administrator of the Environmental Protection Agency*, 5 Cir., 1977, 556 F.2d 1282, 1290–1292. *But see Shell Oil Co. v. Train, supra*, 585 F.2d at 412 (*dicta*).

We decline to ask the court to take this case *in banc* to consider overruling *Scott Paper.* The Sixth Circuit's recent opinion in *Republic Steel Corp. v. Costle, supra*, 581 F.2d at 1230, n. 1, has not persuaded us that *Scott Paper* was wrongly decided. The case simply included a footnote which acknowledged the holding of *Scott Paper*, and announced that the Sixth Circuit would continue to follow its earlier decision in *Ford Motor Co. v. E.P.A., supra*, 567 F.2d at 668.

Decided before *Scott Paper, Ford Motor Company* explained that the factual record in that case "ha[d] been sufficiently developed" to enable the circuit court to "review adequately the action of [the] EPA" in objecting to a state issued permit modification. 567 F.2d at 661, 668. The Fifth Circuit had earlier relied upon the inadequacy of an administrative record in refusing to hear direct petitions under subsection (F) in cases where the record contained no more than the absence of any objection on the part of the Administrator, and thus did not "reveal what factors were considered by EPA in determining not to object . . ." *Save the Bay, Inc. v. Administrator of E.P.A., supra*, 556 F.2d at 1292.

We need not, and do not, evaluate the adequacy of the administrative record in the cases before us, because *Scott Paper* did not hold that this court lacked jurisdiction because of the absence of a record. Rather, it relied upon the language of subsection (F) which it read as requiring the Administrator himself to have issued or denied the

permit. While the impossibility of meaningful direct review does weigh decisively against construing a statute as dispensing with initial district court consideration, the mere feasibility of direct review by itself provides little warrant for disregarding the otherwise plain language of the jurisdictional statute.

In *Mianus River Preservation Commission v. EPA*, 2 Cir., 1976, 541 F.2d 899, 909, the Second Circuit held itself without jurisdiction under subsection (F) to review the Administrator's failure to object to a state proposed permit. It based that decision on its view that a failure to object does not constitute an "Administrator's action" within the meaning of the direct review provision. In *dicta*, it did go on to state that a § 1342(d)(2)(B) objection "would clearly be subject to review as 'Administrator's action.'" 541 F.2d at 909. We fully agree that the Administrator's vetoes in the cases before us amount to "Administrator's action" within the meaning of the opening phrase of § 1369(b)(1). However, as discussed above, only six categories of "Administrator's action" are subject to direct review. We simply do not believe that the Administrator's objections equal "denying [a] permit" within the meaning of subsection (F). Because the *Mianus* dicta did not address this second question, it cannot persuade us that *Scott Paper* was wrongly decided.

Our decision does not leave petitioners without a federal forum in which to challenge the Administrator's veto. Under *Scott Paper, supra*, the district court would have jurisdiction to hear such a challenge. See 573 F.2d at 587–88.[5]

We recognize that under our decisions, whether a disappointed permit applicant must seek judicial review in the district court or in the court of appeals will depend

---

5.  *Scott Paper* appears to have held district court jurisdiction available under Section 10 of the Administrative Procedure Act, 5 U.S.C. §§ 701–706. See 573 F.2d at 588, 590. While *Califano v. Sanders*, 1977, 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192, held that the APA is not an implied grant of federal subject matter jurisdiction, the *Scott Paper* rationale just as strongly supports holding jurisdiction available under 28 U.S.C. § 1331(a). *See Andrus v. Charlestone Stone Products Co.*, 1978, 436 U.S. 604, 607–608, n. 6, 98 S.Ct. 2002, 56 L.Ed.2d 570; *Laden v. Andrus*, 9 Cir., 1978, 595 F.2d 482, 484 (1979). *See also Shell Oil Co. v. Train, supra*, 585 F.2d at 419–20 (dissenting opinion).

upon whether the applicant operates in a state which has taken on primary permit issuing responsibility under § 1342(b). It does not strike us as at all incongruous that Congress would limit our direct review to states in which the EPA alone handles the permit process.

The administration of the Act has already required the processing of over 42,000 permit applications. *See du Pont, supra,* 430 U.S. at 132, 97 S.Ct. 965. Because each application raises the possibility of a separate lawsuit, it seems quite reasonable that Congress may have intended to divide the burden of this potentially staggering new caseload between the district courts and the courts of appeals. *Compare du Pont, supra,* 430 U.S. at 127–28, n. 18, 97 S.Ct. 965.

Nor will our decision undercut Congress's intention ". . . that the discharge of pollutants into the navigable waters be eliminated . . ." as quickly as possible. *See* § 1251(a). We do anticipate that some district court decisions upholding vetoes of state proposed permits will be appealed to this court pursuant to 28 U.S.C. § 1291. It is thus fair to say that our decision will create a second level of review. Nevertheless, this second level of review will not automatically lead to further delays in the implementation of effluent limitations, if we give careful attention to Congress' sense of urgency when passing upon applications for stays pending appeal.

Because we lack subject matter jurisdiction, we dismiss the petitions for review.

RENFREW, District Judge (concurring).

I concur. I am in total agreement that subsection (E) of 33 U.S.C. § 1369(b)(1) does not give this Court jurisdiction. Judge Duniway's thoughtful analysis makes this result abundantly clear. In addition, I agree that the question of our jurisdiction under subsection (F) is controlled by *Scott Paper.* However, I believe that that case was wrongly decided, and I therefore urge the Court to take the present case *en banc* to consider overruling *Scott Paper.*

Section 509(b)(1)(F), 33 U.S.C. § 1369(b)(1)(F), vests the courts of appeals with jurisdiction to review the action of the Administrator "in issuing or denying any [NPDES] permit". In those states that do not administer their own NPDES permit system pursuant to 33 U.S.C. § 1342(b) this provision is easily applied. Since the Administrator is directly responsible for issuing or denying the requested permits, his action, whether affirmative or negative, is immediately subject to review by the courts of appeals. However, in states such as California and Washington that have received EPA approval to administer their own NPDES programs, application of subsection (F) is not as clear. In those states the Administrator does not issue or deny permits directly. Rather, he either "objects in writing to the issuance of such permit," or, by his inaction for a period of 90 days, approves the state's issuance. 33 U.S.C. § 1342(d)(2)(B).

The issue in *Scott Paper,* as in the case before us, was whether the EPA Administrator's written objection to a state-issued permit constituted "action * * * denying any permit" under subsection (F). The Court in *Scott Paper* held that it did not. I do not believe this was the proper result.

One of Congress's stated goals in enacting the Federal Water Pollution Control Act was to eliminate the discharge of pollutants into this country's navigable waters by 1985. *See* 33 U.S.C. § 1251(a)(1). Recognizing that a two-tiered level of judicial review might threaten realization of this goal, Congress vested the courts of appeals with jurisdiction to review many of the actions of the Administrator directly. As the Court of Appeals for the Second Circuit has noted:

"The fact that judicial review of the actions covered by § 1369(b)(1) is in the Court of Appeals in the first instance evidences a purpose, *inter alia,* to save procedural steps and time. After the EPA has completed its administrative proceeding and either denied or issued a permit, to allow challenges to its jurisdiction then to be heard first in the district court would merely cause duplication and delay." *Central Hudson Gas, Etc. v.*

*United States E. P. A.*, 587 F.2d 549, 557 (2 Cir. 1978) (footnote omitted). *See also duPont v. Train*, 528 F.2d 1136, 1141–1142 (4 Cir. 1975), *aff'd*, 430 U.S. 112, 97 S.Ct. 965, 51 L.Ed.2d 204 (1977).

Congress's goal of ensuring prompt resolution of challenges to the Administrator's actions can best be realized by interpreting "denying [a] permit" to include "object[ing] in writing." This result would be consistent with Congressional goals. It would vest the courts of appeals with jurisdiction over the Administrator's "vetoes" in states that administer their own NPDES permit programs as well as in states that do not. Moreover, it would recognize that the functional effect of an administrative veto is that the requested NPDES permit is denied. *See* 33 U.S.C. § 1342(d)(2)(B) (*"No permit shall issue * * * if the Adminis-*

trator * * * objects in writing * * *.") (emphasis added).

Of course, it would not be appropriate to vest jurisdiction in the courts of appeals if the administrative record resulting from the Administrator's action were insufficient or inadequate for review. However, while the incompleteness of the record might be a reason for withholding jurisdiction from the courts of appeals over cases in which the Administrator *approved* a state-issued permit—a process that requires no more than silent acquiescence for the 90-day statutory period—it is not a reason for withholding jurisdiction over cases in which the Administrator *filed a written objection* to a state-issued permit. The administrative record is more complete, and therefore more susceptible to appellate review, in the latter group of cases.[1]

---

1. Once the Administrator files his written objection, the administrative record is certainly sufficient for the courts of appeals to review. At a minimum, it contains a copy of the proposed permit, a

   "statement of the reasons for the objection (including the section of the Act or regulations that support the objection), and

   "[A statement of the] actions that must be taken by the Director in order to eliminate the objection (including the effluent limitations and conditions which the permit would include if it were issued by the Regional Administrator)." 40 C.F.R. §§ 124.47(a), 124.48(a)(2).

   Also, unless the Regional Administrator of the EPA expressly waives his right to receive the following information pursuant to 40 C.F.R. § 124.47(e), the administrative record will contain

   "all terms, conditions, requirements or documents that are a part of any proposed permit or that affect the authorization by the proposed permit of the discharge of pollutants [as well as] a copy of any significant comments presented in writing pursuant to the public notice and a summary of any significant comments presented at any hearing, for any NPDES application if:

   "(1) The Regional Administrator requests this information; or

   "(2) The proposed permit contains requirements different from or less stringent than those contained in the tentative determination and draft permit; or

   "(3) Significant comments adverse to the tentative determination and draft permit have been presented at the hearing or in writing pursuant to the public notice." 40 C.F.R. § 124.47(b), (c).

   Moreover,

   "[f]or every discharge which has a total volume of more than 500,000 gallons on any day of the year, [the administrative record will contain a fact sheet]. The contents of such fact sheets shall include at least the following information * * *:

   "(1) A sketch or detailed description of the location of the discharge described in the NPDES application;

   "(2) A quantitative description of the discharge described in the NPDES application which includes at least the following:

   "(i) The rate or frequency of the proposed discharge; if the discharge is continuous, the average daily flow in gallons per day or million gallons per day;

   "(ii) For thermal discharges subject to limitation under the Act, the average summer and winter temperatures in degrees Fahrenheit; and

   "(iii) The average daily discharge in pounds per day of any pollutants which are present in significant quantities or which are subject to limitations or prohibition under sections 301, 302, 306, or 307 of the Act and regulations published thereunder;

   "(3) The tentative determinations required under § 124.31;

   "(4) A brief citation, including a brief identification of the uses for which the receiving waters have been classified, of the water quality standards and effluent standards and limitations applied to the proposed discharge; and

   "(5) A fuller description of the procedures for the formulation of final determinations than that given in the public notice including:

   "(i) The 30-day comment period required by § 124.32(b);

The two cases relied upon by this Court in *Scott Paper* support this position.[2] In *Save the Bay, Inc. v. Administrator of E.P.A.*, 556 F.2d 1282 (5 Cir.), *rehearing denied*, 560 F.2d 1023 (1977), the Fifth Circuit held that it had no jurisdiction under subsection (F) to review the Administrator's failure to object to a state-issued permit. In reaching this conclusion, the Court was influenced by the inadequacy of the administrative record.

"The administrative record here is wholly inadequate to reveal what factors were considered by EPA in determining not to object * * *. * * * When Congress has vested this court with original review, it generally has done so in relation to an administrative process that more easily lends itself to production of a reviewable record." 556 F.2d at 1292.

When the Administrator vetoes a state-issued permit, as in *Scott Paper* and the case before us, however, he creates an administrative record. Therefore, the reasoning behind the Fifth Circuit's opinion is not applicable. It is perhaps in recognition of this distinction that the Court stated:

"We note that by our decision we suggest no answer to the question whether a veto by EPA would be reviewable directly in this court." 556 F.2d at 1292 n.13.

The Court of Appeals for the Second Circuit employed a similar analysis in *Mianus River Pres. Comm. v. Administrator*, 541 F.2d 899 (2 Cir. 1976). Like the Court of Appeals for the Fifth Circuit, it declined to assert subsection (F) jurisdiction over the Administrator's failure to veto a state-issued permit. However, it made even more explicit the distinction between inaction and veto:

"Admittedly, had the Administrator exercised his right of review and rejected the Water Company's permit application,

"(ii) Procedures for requesting a public hearing and the nature thereof; and

"(iii) Any other procedures by which the public may participate in the formulation of the final determinations." 40 C.F.R. § 124.-33; *see* 40 C.F.R. § 124.48(c)(1).

Finally, if the Regional Administrator had been unable to decide whether to object because the information before him was inadequate, he

that rejection would clearly be subject to review as 'Administrator's action.'" 541 F.2d at 909 (footnote omitted).

In addition to the cases cited in *Scott Paper*, I obtain support for my position in two cases arising in the Sixth Circuit, *Republic Steel Corp. v. Costle*, 581 F.2d 1228 (6 Cir. 1978), and *Ford Motor Co. v. E. P. A.*, 567 F.2d 661 (6 Cir. 1977). Both of these cases specifically held that subsection (F) *does* vest the courts of appeals with jurisdiction to review the Administrator's written objection to state-issued permits. In *Ford Motor Co.*, the court indicated that one of its bases for decision was that "[t]he factual record in this case has been sufficiently developed that this Court can review adequately the action of EPA." 567 F.2d at 668. Moreover, in *Republic Steel* the court not only rejected the analysis in *Scott Paper*, but also cited in support of its contrary result the *Mianus River* decision discussed above. 581 F.2d at 1230 n.1.

Somewhat ironically, the *Scott Paper* decision itself underscores the need for immediate appellate review of the Administrator's vetoes of state-issued NPDES permits. In *Scott Paper*, after the panel concluded that it lacked subject matter jurisdiction under subsection (F) to review Scott Paper's petition, 573 F.2d at 587, it made the remarkable statement:

"Although we hold that the district court has jurisdiction to entertain Scott's challenge to the Administrator's objection to the Anacortes permit, we need not, in light of the record before us, remand the case for additional proceedings. That course is made unnecessary by the presence of a dispositive legal issue which we resolve in the interests of judicial economy. *Cf. Save the Bay, Inc. v. Administrator of E. P. A., supra*, 556 F.2d at 1292." *Id.* at 588.

could have supplemented the administrative record with "the complete record of the permit proceedings before the State." 40 C.F.R. § 124.48(c)(2).

**2.** *See State of Washington v. United States Environmental Protection Agency*, 573 F.2d 583, 587 (9 Cir. 1978) (*Scott Paper*).

**908**

Considerations of "judicial economy" notwithstanding, it has long been a fundamental principle of our federal system that a court has no power to entertain a case where subject matter jurisdiction is lacking. *See, e. g., Ex parte McCardle,* 74 U.S. (7 Wall.) 506, 514, 19 L.Ed. 264 (1868); *Sheldon v. Sill,* 49 U.S. (8 How.) 441, 448, 450, 12 L.Ed. 1147 (1850); *Turner v. President, Directors and Co. of the Bank of North America,* 4 Dallas 8, 11 (1799). The willingness of the Court of Appeals to violate this principle in *Scott Paper* not only lends credence to my conclusion that appellate courts *should* dispose of petitions challenging the Administrator's vetoes, but it also demonstrates that the record before them is sufficiently developed that they *can* do so.

Finally, I note that *Shell Oil Co. v. Train,* 585 F.2d 408 (9 Cir. 1978), cited by Judge Duniway with a *"But see"* signal, is in part contrary to the result reached by my colleagues. It therefore furnishes another ground for *en banc* review. The issue in *Shell Oil* was whether the Court of Appeals had jurisdiction under subsection (F) to review the state regional board's denial of an NPDES permit. Shell had alleged that even though the denial was by a state agency, that agency had been "caused" to deny the permit by the EPA. However the Court of Appeals held that *Scott Paper* was not controlling because "Shell [had] not alleged an actual veto by the EPA of the regional board's decision." 585 F.2d at 413.

In the part of the opinion that supports the position I take here, however, the Court focused on a second action brought by Shell to challenge the regional board's denial of its requested permit. In addition to the federal suit then before the Court, Shell had sought review of the regional board's action by petitioning the California State Water Resources Control Board. While the federal action was pending in district court, the state board reversed the regional board and granted Shell a variance on its Class E permit. The proposed variance was then transmitted to the EPA Administrator pursuant to 33 U.S.C. § 1342(d), and he vetoed it by filing a written objection. "That decision," wrote the majority of the panel, "is

reviewable in this court under 33 U.S.C. § 1369(b)(1)." 585 F.2d at 412. The only subsection of § 1369(b)(1) the Court could have been referring to was subsection (F). Thus, the *dicta* in *Shell Oil* directly contradicts *Scott Paper* and supports the position I have taken.

In conclusion, I urge the Court to reconsider *Scott Paper* by taking the present case *en banc.* Because of the congressional desire for speedy resolution of disputes under the Act, the need for a consistent system of judicial review, the functional effect of the Administrator's written objections, and the sufficiency of the administrative record, I would find that the courts of appeals, rather than the district courts, have initial jurisdiction to review the Administrator's vetoes of state-issued NPDES permits.