642 F.2d 323
 16 ERC 1556, 11 Envtl. L. Rep. 20,450
 CROWN SIMPSON PULP COMPANY, Petitioner,
v.
Douglas M. COSTLE (formerly Russell E. Train), As
Administrator, Environmental Protection Agency,
Respondent.
LOUISIANA-PACIFIC CORPORATION, Petitioner,
v.
Douglas M. COSTLE (formerly Russell E. Train), As
Administrator, Environmental Protection Agency,
Respondent.
CROWN SIMPSON PULP COMPANY and Louisiana-Pacific
Corporation, Petitioners,
v.
Douglas M. COSTLE, As Administrator, Environmental
Protection Agency, Respondent.
 Nos. 76-3161, 76-3287 and 77-3322.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted July 11, 1980.
Decided April 20, 1981.
 
 Jack B. Owens, Orrick, Herrington, Rowley & Sutcliffe, San Francisco, Cal., argued for Crown Simpson Pulp Co.; W. Reece Bader, San Francisco, Cal., on brief.
 Joseph A. Darrell, Thelen, Marrin, Johnson & Bridges, San Francisco, Cal., for Louisiana-Pac. Corp.
 James A. Rogers, Richard G. Stoll, Washington, D.C., argued for E.P.A.; James W. Moorman, Dept. of Justice, Washington, D.C., and Dean K. Dunsmore on brief.
 Kenneth S. Kamlet, Washington, D.C., for Nat. Wildlife.
 Petitions to Review Decision of the Environmental Protection Agency.
 Before DUNIWAY, CHOY and SNEED, Circuit Judges.
 DUNIWAY, Circuit Judge:
 
 
 1
 Crown Simpson Pulp Company and Louisiana-Pacific Corporation petition for review of the decision of the Environmental Protection Agency (EPA) to veto two pollutant discharge permits that the California State Water Resources Control Board proposed to issue to the Companies. The proposed permits would grant the Companies variances from two EPA effluent limitations. In Crown Simpson Pulp Co. v. Costle, 9 Cir., 1979, 599 F.2d 897, we dismissed these cases for lack of jurisdiction. The Supreme Court reversed, finding jurisdiction under § 509(b) (1)(F) of the Federal Water Pollution Control Act Amendments of 1972 (the Act), 33 U.S.C. § 1369(b)(1)(F), and remanded the case to us for further proceedings. Crown Simpson Pulp Co. v. Costle, 1979, 445 U.S. 193, 100 S.Ct. 1093, 63 L.Ed.2d 312. Reaching the merits, we now affirm the agency's action.
 
 
 2
 I. The Facts.
 
 
 3
 Because we have already described the facts and relevant statutory provisions in this case in our earlier decision, 599 F.2d at 899-900, we sketch them only briefly here. Further description of the statutory scheme can be found in EPA v. National Crushed Stone Association, 1980, --- U.S. ----, 101 S.Ct. 295, 66 L.Ed.2d 268; E.I. du Pont de Nemours & Co. v. Train, 1977, 430 U.S. 112, 97 S.Ct. 965, 51 L.Ed.2d 204; Weyerhaeuser Co. v. Costle, D.C.Cir., 1978, 590 F.2d 1011.
 
 
 4
 The Companies operate two bleached kraft pulp mills located on the Samoa Peninsula, on the west side of Humboldt Bay in California. Each mill discharges effluent into the Pacific Ocean through a separate deepwater outfall diffuser system designed in consultation with the State. In February, 1976, acting under Section 301(b) of the Act, 33 U.S.C. § 1311(b), the EPA issued effluent limitations for different types of bleached kraft pulp, paper and paperboard mills discharging into navigable waters. 40 C.F.R. part 430, subparts F-I. As required by this section of the Act, these regulations impose discharge limits, for the period July 1, 1977 to July 1, 1983, based on "the application of the best practicable control technology currently available as defined by the Administrator." The regulations also include a provision for a variance from the discharge limits where the discharger demonstrates that "factors relating to the equipment or facilities involved, the processes applied, or other such factors related to such discharger are fundamentally different from the factors considered in the establishment of the guidelines." See, e. g., 40 C.F.R. § 430.62. (emphasis added).
 
 
 5
 In March, 1977, the California State Water Resources Control Board an agency approved by the EPA under § 402(b) of the Act, 33 U.S.C. § 1342(b) to grant discharge permits proposed to issue discharge permits to the Companies that included variances from two of the effluent limitations set by the EPA guidelines for bleached kraft pulp mills. Under § 402 of the Act, 33 U.S.C. § 1342, all dischargers must obtain such discharge permits to continue discharging, and permits are granted only to dischargers who either conform to EPA's effluent limits or merit a variance.
 
 
 6
 Subject to the approval of the Administrator of EPA, the State Board granted variances to the Companies from EPA guidelines for biochemical oxygen demand of effluent (BOD) "The BOD of a waste exerts an adverse effect upon the dissolved oxygen resources of a body of water by reducing the oxygen available to fish, plant life, and other aquatic species," In re Louisiana-Pacific Corp., 1977, 10 E.R.C. 1841, 1845 (citation omitted) and for the pH, e. g., acidity or alkalinity, of effluent. The State Board concluded after several days of hearings that the non-water quality environmental effects of adhering to these guidelines adherence to the EPA guidelines for BOD and pH would require construction and operation of a treatment facility outweighed the water quality benefits. It said: "... the existing discharges result in no water quality problems ... there is no expected or predictable water quality improvement to be achieved as the result of imposition of the EPA Guidelines. In light of ... the magnitude of the chemical and energy requirements, and the potential air and land management problems associated with sludge disposal ... we can only conclude the evidence justified the variance requested." In re Louisiana Pacific Corp., supra, 10 E.R.C. at 1850. Accordingly the State Board proposed to grant permits to the Companies, authorizing limits of BOD and pH far above those set in EPA's guidelines.
 
 
 7
 In a lengthy decision issued September 15, 1977, the Administrator vetoed the permits and denied the variance requests. In re Louisiana-Pacific Corp., supra. The Administrator emphasized that the State Board had not found as the variance provision required that the non-water quality environmental effects of adherence to the limitations in this case were "fundamentally different" from those considered by EPA in publishing effluent limitations for the industry as a whole: "It is clear that the Board did not find a 'fundamental difference' in terms of non-water quality impact itself but instead found non-water quality impact to be significant because of lack of improvement of local receiving water quality. In effect, the State granted an exemption from minimum national technology-based standards because of local water quality considerations. This was contrary to the letter and intent of the (Act) and I have no choice but to disapprove the state action." 10 E.R.C. at 1844. (emphasis in original). The Companies petition for review of EPA's decision.
 
 
 8
 II. The Merits.
 
 
 9
 To begin with, we note that the issue in this case is not whether a variance may be granted because of such factors as the non-water environmental effects of adherence to the general effluent limitations. The agency has now explicitly stated, both in its opinion in this case as well as in more recent regulations, 40 C.F.R. §§ 124.30-125.32, that the factors which the agency must consider under § 304(b)(1), 33 U.S.C. § 1314(b)(1), in determining the standard of best practicable technology will also be considered by the agency in deciding whether a plant is fundamentally different and thus whether a variance is appropriate. These factors include non-water quality environmental impact, energy requirements, and cost in relation to effluent reduction benefit as well as several other factors.
 
 
 10
 Nor is the issue whether the agency must insist that a particular discharger show a "fundamental difference" in his plant as to one or more of the factors considered by EPA in setting the guidelines for the industry category before granting a variance. The Companies do not challenge the fundamental difference requirement and it has been upheld explicitly in Weyerhaeuser Co. v. Costle, supra, 590 F.2d at 1040, a case to which Crown Simpson was a party, as well as implicitly in the recent opinion in EPA v. National Crushed Stone Association, 1980, --- U.S. ----, 101 S.Ct. 295, 66 L.Ed.2d 268 (Dec. 2, 1980).
 
 
 11
 Rather, the issue is whether, in insisting that a particular discharger show a "fundamental difference" in his plant before granting a variance, the agency must consider receiving water quality as a factor that may make a fundamental difference either in itself or because other factors may be considered fundamentally different when assessed in the light of receiving water quality. Thus, the Companies contend that a variance must be granted where the non-water environmental costs of adherence to the guidelines are high although not "fundamentally different" and the benefits of adherence to the receiving water are apparently negligible. We disagree.
 
 
 12
 In granting a variance on the basis of non-water quality environmental effects viewed in the light of receiving water quality, the State Board nowhere found that the non-water environmental effects of adherence to EPA's guidelines would be "fundamentally different" for these two companies' plants as opposed to others in the industry. This was not simply a failure by the State Board to make itself clear. The State Board fully understood the requirement: It rejected the Companies' claim that their costs of adherence justified a variance by finding that these costs were not "substantially different from the costs EPA found would be sustained on an industry-wide basis." Moreover, one of the Companies' own witnesses gave testimony to the State Board specifically denying any fundamental difference as to non-water quality environmental impact:
 
 
 13
 Q. How does your plant compare in the area of non-water quality environmental impacts with the plants that EPA utilized in developing the guidelines?
 
 
 14
 A. I don't think there's that much difference. 10 E.R.C. at 1853 n.29.
 
 
 15
 His answer applied to the mills of both Companies.
 
 
 16
 Thus, we reject the Companies' suggestion that the State Board found a fundamental difference as to non-water quality environmental impact in substance and merely failed to enunciate the exact words or that receiving water quality played only a subsidiary part in the Board's decision to grant variances. To the contrary, it is clear from the State Board's opinion that it would not have granted the variances except for its consideration of receiving water quality. And it was because of this heavy reliance on receiving water quality that the Administrator felt compelled, in view of his interpretation of the Act, to disapprove the variances. It is thus upon this interpretation of the Act that the dispute hinges.
 
 
 17
 When faced with a problem of statutory construction, "(we show) great deference to the interpretation given the statute by the officers or agency charged with its administration." EPA v. National Crushed Stone Association, supra, 101 S.Ct. at 307, quoting Udall v. Tallman, 1965, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616. The opinion of the Administrator persuasively argues that to base effluent limitations or variances from these limitations on local water quality considerations would be inconsistent with the Act and its legislative history. 10 E.R.C. at 1846-50. Judge McGowan's enlightening opinion in Weyerhaeuser Co. v. Costle, supra, reached the same conclusion, finding "that based on long experience, and aware of the limits of technological and administrative flexibility, Congress made the deliberate decision to rule out arguments based on receiving water quality." 590 F.2d at 1042. Similarly, we stated in Association of Pacific Fisheries v. EPA, 9 Cir., 1980, 615 F.2d 794, 805, that "We agree with the Agency's contention that Congress intended BPT (Best Practicable Control Technology) standards to be based primarily on employment of available technology for reducing effluent discharge, and not primarily on demonstrated changes in water quality." See Pacific Legal Foundation v. Quarles, C.D.Cal., 1977, 440 F.Supp. 316, 326, affirmed Kilroy v. Quarles, 9 Cir., 1980, 614 F.2d 225.
 
 
 18
 We need not repeat here the exhaustive discussions of the legislative history of the Act provided by the Administrator's decision and by the court in Weyerhaeuser Co. v. Costle, supra. These discussions demonstrate that a fundamental purpose of the Act was to shift pollution control from a focus on receiving water quality to a focus on the technological control of effluent. See EPA v. State Water Resources Control Board, 1976, 426 U.S. 200, 204-05, 96 S.Ct. 2022, 2024-25, 48 L.Ed.2d 578. Above all the Act seeks to "avoid imposing on the Administrator any requirement to consider the location of sources within a category or to ascertain water quality impact of effluent controls." Weyerhaeuser Co. v. Costle, supra, 590 F.2d at 1045 n.52 (quoting Senator Muskie). We therefore affirm the agency's decision that the State Board erred in proposing a variance for reasons relating to receiving water quality. Without finding a fundamental difference as to any factor or combination of factors considered by EPA in setting effluent limitations for the industry category, the State Board could not, consistently with the Act, grant variances on the basis of receiving water quality. See Consolidation Coal Co. v. Costle, 4 Cir., 1979, 604 F.2d 239, 244-45.
 
 
 19
 Our holding does not deprive the Act or industry of a meaningful variance provision or the states of a significant role in administering the Act. Under EPA regulations variances have been granted, and are appropriately granted, by the state or EPA when a discharger's plant is substantially or fundamentally different as to those factors considered by the EPA in drawing up the guidelines. Indeed, in his opinion in this case the Administrator took care not to foreclose the possibility of a future variance for the two companies here, and emphasized the continuing importance of the State Board in the variance and permit process: "I ... express no opinion as to whether the two mills could be found fundamentally different in terms solely of non-water quality environmental impact. This is a matter properly addressed in the first instance by the State.... There is no reason why, in a proper case, a fundamental difference in non-water quality environmental impact could not justify a variance." 10 E.R.C. at 1853 n.30. To rule out variances granted in large measure because of receiving water quality merely requires that the states or EPA grant variances in accordance with the basic purpose of the Act; it does not put an end to variances or to the state's role in granting them.
 
 
 20
 Our holding in this case is consistent with our decision in Association of Pacific Fisheries v. EPA, supra, 615 F.2d at 794. In Pacific Fisheries we upheld EPA's issuance of permits to certain Alaskan fish processors. The best practicable control technology for these processors was determined to be the installation of screens to strain out larger fish particles from the plants' discharge. The permits issued to certain of these processors allowed, among several methods of disposal, the barging and dumping of screened-out solids at certain offshore ocean sites. EPA had not considered water quality in categorizing the industry or in setting effluent limitations for each category. It considered water quality only in issuing certain permits. Plaintiff did not challenge EPA's consideration of water quality in issuing permits but argued that if barging and dumping were permissible so too should grinding and dispersion of effluent be permissible.
 
 
 21
 Although noting that "(t)he Agency has not explained to this court as clearly as it might have how the asserted water quality benefits of discharging a given amount of effluent farther offshore should be considered within the statutory framework of technology-based, not water quality-based, pollution limitations," we held that "(i)t was not an abuse of discretion for the Agency to consider an improvement in nearshore water quality as one factor in support of the effluent limitation." 615 F.2d at 807. We found specific support in the legislative history for a limited consideration of water quality in framing effluent standards for the Alaskan fish processing industry.
 
 
 22
 We certainly did not hold in Pacific Fisheries, as the Companies appear to contend, that the agency must consider water quality in framing effluent guidelines. Indeed, we explicitly affirmed the D.C. Circuit's position that the Act seeks to reduce pollution by technology based standards and not by standards based on receiving water quality. Thus, we only permitted a limited consideration of receiving water quality in an unusual factual setting.
 
 
 23
 Moreover, we explicitly declined to decide "the extent to which, if the EPA relies on water quality evidence in measuring the benefits of requiring a particular technology for a category or subcategory of point sources, it must also consider water quality evidence at particular sites in passing on applications for variances." 615 F.2d at 807 n.9. Here, EPA did not rely on water quality evidence and thus the question posed but not answered in Pacific Fisheries need not be answered here. We also note, as we did there, that a fundamental purpose of the Act was to free EPA from the incubus "of proving in every case the application of an effluent limitation at a specific site will improve water quality at that site." 615 F.2d at 807 n.8. Thus, even if EPA could base industry guidelines to a limited degree on local water quality considerations, if we were to permit companies to seek variances from these guidelines on the basis of water quality at particular sites, we would be returning water pollution control to its ineffective pre-1972 status in defiance of Congress's desire "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters."
 
 
 24
 In short, our decision in Pacific Fisheries has not suddenly rehabilitated the discredited approach of water quality based pollution control. The Administrator's holding that the Act does not permit either industry-wide guidelines or variances to be based solely or in large part on local water quality considerations is not inconsistent with our Pacific Fisheries opinion.
 
 
 25
 Finally, the Companies argue on the basis of Costle v. Pacific Legal Foundation, 1980, 445 U.S. 198, 100 S.Ct. 1095, 63 L.Ed.2d 329, that if any material issues of fact were present further hearings should have been provided before the Administrator decided. However, the Companies do not contend that there were any such issues, and the Administrator accepted all of the State Board's factfindings for purposes of his opinion. We need not consider the merits of the Company's claim that a hearing would be required in different circumstances.
 
 
 26
 The decision of the Administrator is affirmed.