**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

OUR CHILDREN'S EARTH
FOUNDATION, and ECOLOGICAL
RIGHTS FOUNDATION; ECOLOGICAL
RIGHTS FOUNDATION,
          *Plaintiffs-Appellants,*

                    v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY; MICHAEL O.
LEAVITT, Administrator of EPA;
STEVEN L. JOHNSON,
          *Defendants-Appellees,*

ASSOCIATION OF METROPOLITAN
SEWERAGE AGNENCIES; EFFLUENT
GUIDELINES INDUSTRY COALITION;
THE UTILITY WATER ACT GROUP
(UWAG); NATIONAL
ASSOCIATION OF CLEAN WATER
AGENCIES (NACWA),
          *Defendants-Intervenors-*
                *Appellees.*

No. 05-16214

D.C. No.
CV-04-02132-PJH

OPINION

Appeal from the United States District Court
for the Northern District of California
Phyllis J. Hamilton, District Judge, Presiding

Argued and Submitted
February 13, 2007—San Francisco, California

Filed October 29, 2007

Before: J. Clifford Wallace, Dorothy W. Nelson, and
M. Margaret McKeown, Circuit Judges.

14215

Opinion by Judge McKeown;
Partial Concurrence and Partial Dissent by Judge Wallace

**COUNSEL**

Christopher Sproul, Environmental Advocates, San Francisco, California, for the appellant.

Sue Ellen Wooldridge, Assistant Attorney General, Washington, DC, for the appellees.

Fredric P. Andes, Carolyn S. Hesse, and David T. Ballard, Barnes & Thornburg, L.L.P., Chicago, Illinois, for intervenor-appellee Effluent Guidelines Industry Coalition.

David W. Burchmore and Jill A. Grinham, Squire, Sanders, & Dempsey L.L.P., Cleveland, Ohio, for intervenors-appellees Association of Metropolitan Sewerage Agencies, now known as National Association of Clean Water Agencies.

Melanie Shepherdson, National Resources Defense Counsel, Washington, DC, amicus in support of the appellants.

Jeffrey Odefey, Waterkeeper Alliance, Tarrytown, New York, amicus in support of the appellants.

---

## OPINION

McKEOWN, Circuit Judge:

In 1972 Congress passed the Clean Water Act ("CWA" or "the Act") "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." *See* Federal Water Pollution Control Act Amendments of 1972 (Clean Water Act of 1972), Pub. L. No. 92-500, 86 Stat. 816 (1972), codified at 33 U.S.C. § 1251(a). Central to that legislation and later amendments is the notion that pollution discharges would be controlled through technology-based effluent limitations.

Environmental advocates, Our Children's Earth Foundation and Ecological Rights Foundation (collectively "OCE"), filed this citizen suit under the Clean Water Act, 33 U.S.C. § 1251 *et seq.*, alleging that the Environmental Protection Agency ("EPA" or "the Agency") has failed to fulfill its mandate to review effluent guidelines and limitations in a timely manner and in accord with technology-based standards. Specifically, OCE claims that EPA violated its statutorily-mandated duties by abandoning *technology-based* review in favor of *hazard-based* review; neglecting to identify *new* polluting sources;

and failing to publish timely plans for future reviews. *See* CWA § 301(b), 33 U.S.C. § 1311(b); CWA § 301(d), 33 U.S.C. § 1311(d); CWA § 304(b), 33 U.S.C. § 1314(b); CWA § 304(m), 33 U.S.C. § 1314(m).[1]

A technology-based approach to water quality focuses on the achievable level of pollutant reduction given current technology, whereas a hazard-based[2] approach seeks to identify known hazards or contaminants in the water and to reduce the prevalence of those hazards. *See, e.g.*, S. Rep. No. 92-414, at 8 (1971), 1972 U.S.C.C.A.N. 3668, 3674-78. Although these approaches are not mutually exclusive, OCE claims that EPA jettisoned a technology-based approach altogether, thus abdicating its statutory duties.

The district court granted judgment in favor of EPA, holding that the challenged acts or omissions were discretionary. We agree that the decision whether to revise the effluent guidelines falls within EPA's discretion. We do not agree, however, that in its periodic review of the guidelines, EPA has discretion to ignore the technology-based criteria. Consequently, we affirm in part, reverse in part, and remand for further proceedings.

## BACKGROUND

OCE's amended complaint contains four claims alleging non-compliance with what OCE characterizes as EPA's mandatory duties under the Act:

---

[1]Sections of the Clean Water Act, 33 U.S.C. § 1251 *et seq*., are conventionally cited using the sections of the original Act, rather than the section numbers assigned after codification in the U.S. Code. We follow that convention here. The first time we cite to a provision of the Act, we include a preliminary parallel citation to the U.S. Code. All citations are to the CWA unless indicated otherwise.

[2]Hazard-based regulation is also referred to in the record as water-quality-based and harm-based regulation.

(1) EPA failed to review effluent guidelines based on the "best conventional pollutant technology" ("BCT") and "best available technology" ("BAT"), as mandated by § 304(b), (m);

(2) EPA failed to review existing effluent limitations as required by § 301(b), (d);

(3) EPA failed to issue timely final effluent guidelines plans as required by § 304(m)(1); and

(4) EPA failed to identify *new* polluting sources as required by § 304(m)(1)(B).

In sum, OCE argues that the CWA requires, as a non-discretionary matter, that the Agency take a particular approach to water safety regulation: technology-based review, published in a sufficiently timely fashion to afford a meaningful opportunity for notice and comment. EPA and Intervenors Effluent Guidelines Industry Coalition and Association of Metropolitan Sewerage Agencies (now known as the National Association of Clean Water Agencies) (together, "Intervenors") counter that EPA's non-discretionary duties do not extend to a particular manner of performing reviews and revisions.

We first address the argument by EPA and the Intervenors that this suit was not properly brought under the citizen suit provision of the Act, § 505(a), 33 U.S.C. § 1365(a)(2), but rather should have been brought under § 509(b)(1), 33 U.S.C. § 1369(b)(1). Then, we consider whether the district court has jurisdiction over each of OCE's four claims under § 505(a)(2). Because § 505(a)(2) jurisdiction is predicated on citizen enforcement of a non-discretionary duty, our analysis focuses on whether the claims relate to discretionary or non-discretionary duties under the Act.

ANALYSIS

## I.  JURISDICTION TO REVIEW AGENCY ACTION[3]

**[1]** The CWA contains two separate jurisdictional sections: § 505(a), known as the citizen suit provision, and § 509(b)(1), which relates primarily to challenges to promulgation of certain standards and determinations. OCE brought suit under § 505(a)(2), which permits "any citizen [to] commence a civil action on his own behalf . . . against the Administrator where there is alleged a failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator."[4] CWA § 505(a)(2).

**[2]** Alternatively, § 509(b)(1) permits suits against the EPA Administrator for review of action

> (A) in promulgating any standard of performance under section 1316 of this title, (B) in making any determination pursuant to section 1316(b)(1)(C) of this title, (C) in promulgating any effluent standard, prohibition, or pretreatment standard under section 1317 of this title, (D) in making any determination as to a State permit program submitted under section 1342(b) of this title, (E) in approving or promulgating any effluent limitation or other limitation under section 1311, 1312, 1316, or 1345 of this title, (F) in issuing or denying any permit under section 1342 of

---

[3]The Agency's position on jurisdiction is not entitled to deference under *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984). *See, e.g.*, *Fox Television Stations, Inc. v. FCC*, 280 F.3d 1027, 1038-39 (D.C. Cir. 2002) ("Nor is an agency's interpretation of a statutory provision defining the jurisdiction of the court entitled to our deference under *Chevron*.") (citing *Adams Fruit Co. v. Barrett*, 494 U.S. 638, 650 (1990)).

[4]OCE's amended complaint also cites the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 702, 706, as an alternative basis for jurisdiction, but does not allege any claims under the APA.

this title, and (G) in promulgating any individual control strategy under section 1314(l). . . .

Suits brought pursuant to § 509(b)(1) must be filed directly

> in the Circuit Court of Appeals of the United States for the Federal judicial district in which [petitioner] resides or transacts business. Any such application shall be made within 120 days from the date of such determination, approval, promulgation, issuance or denial, or after such date only if such application is based solely on grounds which arose after such 120th day.

CWA § 509(b)(1). Section 509(b)(1) actions, as opposed to suits brought under § 505(a)(2), challenge the exercise of the Administrator's discretion in promulgating standards and issuing determinations.

[3] So long as EPA's challenged acts and omissions relate to non-discretionary duties under the Act, OCE's action was properly brought in the district court under § 505(a)(2). To the extent OCE challenges actions within the discretion of the Administrator, the district court properly refused to exercise jurisdiction under § 505(a)(2). Nonetheless, a jurisdictional defect under § 505(a)(2) does not mean that jurisdiction is proper under § 509(b)(1).

"[T]his Court has counseled against expansive application of section [509(b)]." *League of Wilderness Defenders v. Forsgren*, 309 F.3d 1181, 1190 n.8 (9th Cir. 2002). Section 509(b)(1) covers only challenges to "promulgation" or "approval" or "determinations" on permits, not failure to comply with allegedly mandated procedures, which is the thrust of OCE's suit.

Additionally, § 509(b)(1) lists a number of sections for which review obtains in the court of appeals: §§ 301, 1312,

304(*l*), 1316, 1317, 1342, and 1345. Neither §§ 304(b) or 304(m) are referenced in § 509(b)(1). Because the challenge here does not stem from the promulgation or approval of an effluent limitation or permit, we need not decide whether § 509(b) encompasses a challenge under § 304. *Compare E.I. du Pont de Nemours & Co. v. Train*, 430 U.S. 112 (1977) (suggesting that the EPA could collapse the limitations to be promulgated under §§ 301 and 304 into a single review), with *Longview Fibre Co. v. Rasmussen*, 980 F.2d 1307, 1310 (9th Cir. 1992) (holding that the sections listed in § 509 are sufficiently specific that unlisted sections should not be interpreted to be covered by § 509).

**[4]** We thus agree with the district court that the circuit court's exclusive jurisdiction "extends only to a substantive review of the appropriateness of the guidelines actually promulgated, and not to the threshold question of whether the statutory requirements of the CWA have been met." No such promulgated guidelines or limitations are at issue here. The district court had jurisdiction under § 505(a)(2) to determine whether EPA discharged its non-discretionary duties under the CWA.

## II.   The *Chevron* Framework

In determining whether OCE's four claims challenge non-discretionary obligations under the Act, our first point of reference is the statute itself. We must first address whether Congress resolved the contested issues in the statute. If so, "the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *See Chevron*, 467 U.S. at 842-43. *Chevron* deference is not due where the clear dictates of the statute counsel an interpretation different from the Agency's. *See Bonneville Power Admin. v. FERC*, 422 F.3d 908, 920 (9th Cir. 2005). We "must reject administrative constructions which are contrary to clear congressional intent." *Chevron*, 467 U.S. at 843 n.9.

In the event that congressional intent cannot be determined or is ambiguous, the second step of the *Chevron* analysis considers whether the agency's interpretation of the statute is a reasonable one. *Id.* at 843. Even if an opposing construction of the statute is better supported by policy considerations, we do "not sit to judge the relative wisdom of competing statutory interpretations." *Chem. Mfrs. Ass'n v. Natural Res. Def. Council, Inc.*, 470 U.S. 116, 134 (1985). As long as the agency's construction "is not inconsistent with the language, goals, or operation of the Act," the agency should prevail. *Id.* However, the agency "may not ignore factors Congress required be taken into account." *Earth Island Inst. v. Hogarth*, 484 F.3d 1123, 1131 (9th Cir. 2007).

Although the line between a congressional mandate and an area of agency discretion is not difficult to state, ascertaining that line is not always as easy. When Congress specifies an obligation and uses the word "shall," this denomination usually connotes a mandatory command. *See Alabama v. Bozeman*, 533 U.S. 146, 153 (2001). On the other hand, "[a]bsent some provision requiring EPA to adopt one course of action over the other, we can only conclude that EPA's choice represented an exercise of discretion." *Farmers Union Cent. Exch. v. Thomas*, 881 F.2d 757, 761 (9th Cir. 1989).

However, not every decision is so easily categorized. As the Supreme Court teaches, the decision-making process does not necessarily collapse into a single final decision. "It is rudimentary administrative law that discretion as to the substance of the ultimate decision does not confer discretion to ignore the required procedures of decisionmaking." *Bennett v. Spear*, 520 U.S. 154, 172 (1997). In *Bennett*, considering a citizen suit provision parallel to that in the CWA, the Supreme Court held, "[s]ince it is the omission of these *required* procedures that petitioners complain of, their . . . claim is reviewable." *Id.* at 172 (emphasis added).

With these general principles in mind, we consider the CWA provisions relevant to each of OCE's claims to deter-

mine whether the particular claim relates to a mandatory obligation or discretionary agency function under the Act.

### III.    TECHNOLOGY-BASED REVIEW AND REVISION

### A.    HISTORY OF THE CWA AND TECHNOLOGY

By way of brief overview, when the CWA was enacted in 1972, its stated goal was the elimination of all discharges of pollutants into the Nation's waters by 1985. *See* CWA § 101(a)(1); 33 U.S.C. § 1251(a)(1). This goal was to be accomplished through ambitious technological improvements, because the previous water-quality based approach to pollutant control had been "limited in its success." S. Rep. No. 92-414, at 8 (1971), 1972 U.S.C.C.A.N. at 3675. In the CWA's Declaration of Goals and Policy, Congress wrote, "it is the national policy that a major research and demonstration effort be made to develop technology necessary to eliminate the discharge of pollutants into the navigable waters, waters of the contiguous zone, and the oceans." CWA § 101(a)(6).

The CWA formally prohibits the "discharge of a pollutant" from any source into navigable waters except when authorized by a permit issued under the National Pollutant Discharge Elimination System ("NPDES"). *See* CWA § 301(a). NPDES permits, issued either by the EPA, or by the states in a federally-approved permitting system, are statutorily required to set forth, at the very least, "effluent limitations"— that is, certain "restriction[s] . . . on [the] quantities, rates, and concentrations of chemical, physical, biological, and other constituents which are discharged . . . into navigable waters." *Waterkeeper Alliance, Inc. v. EPA,* 399 F.3d 486, 491 (2d Cir. 2005) (citing *S. Fla. Water Mgmt. Dist. v. Miccosukee Tribe of Indians*, 541 U.S. 95 (2004)).

The specific effluent limitations contained in each NPDES permit are determined by the terms of more general "effluent limitation guidelines," which are separately promulgated by

the EPA. The effluent limitations and the guidelines have long been understood to be determined according to the best available or practicable technology. *See E.I. du Pont de Nemours & Co.*, 430 U.S. at 121 (explaining the technology-based character of effluent limitations and guidelines); *see also Waterkeeper Alliance*, 399 F.3d at 491 ("ELGs, [Effluent Limitation Guidelines] and the effluent limitations established in accordance with them, are technology-based restrictions on water pollution. They are technology-based, because they are established in accordance with various technological standards that the Act statutorily provides . . . .").

Since 1972 Congress has amended the CWA on a number of occasions. In the 1985 amendments, Congress reaffirmed its commitment to a technology-based approach to water quality regulation:

> The technology-based approach to water pollution control was adopted in 1972 because of the historical ineffectiveness of the previous water-quality-based approach. This approach failed because of uncertainties about the relationship between pollutant loadings and water quality and the association between water quality and health and environmental effects. There are still significant gaps in knowledge of these relationships. Consequently the reported bill reaffirms the technologically-based approach established in 1972 as an immediate and effective method of achieving the goals of the Act.

S. Comm. on Env't & Pub. Works, 99th Cong., Report to Accompany S. 1128 (1985 Clean Water Act Amendments) 3-4 (Comm. Print 1985).

## B.  THE STATUTORY FRAMEWORK

[5] Three key statutory provisions of the CWA are at issue here: §§ 301(d), 304(b) and 304(m). Section 301(d) requires

EPA to review, every five years, the effluent limitations established under § 301(b)(2) and to revise such regulations "if appropriate." These processes are undergirded by a series of mandated criteria stating what the regulations "shall" contain. The mandated criteria include technology-based requirements. Sections 304(b) and (m) require an annual review of "guidelines for effluent limitations" applicable to direct dischargers and revision "if appropriate." As in § 301, § 304(b) includes mandated criteria that reference technology-based requirements, without differentiating between application of these criteria to promulgation, review or revision. Section 304(m) specifically provides for a schedule for review of the guidelines in accordance with § 304(b).

According to EPA, rather than conducting separate reviews, it consolidates effluent limitations required under § 301(d) into effluent limitation guidelines under § 304(b). As EPA puts it: "through its annual review of its consolidated 'effluent limitation guidelines' EPA also reviews the effluent limitations they contain, thus meeting its review requirements under § 301(d) and § 304(b) simultaneously."

## C.  CRITERIA FOR REVIEW AND REVISION

It is undisputed that EPA has an obligation to review effluent guidelines and limitations for possible revision, and that such a review is mandatory. It is also undisputed that EPA's ultimate decision *whether* to revise the guidelines and limitations is discretionary, as "appropriate." And, it is undisputed that any revision must be in accord with detailed statutory criteria that incorporate variants of the best-technology standard. What remains in dispute is whether, as part of its mandated *review* process, EPA must consider the technology-based criteria. To address this question, we begin with the statute itself.

[6] The Act imposes on EPA non-discretionary duties to review its current effluent limitations guidelines regulating

the pollutants discharged into the nation's waters, and, "where appropriate," to revise them, according to the criteria in the statute. *See* CWA §§ 301(d); 304(b), (m). Under § 304(b), "the Administrator shall, after consultation with appropriate Federal and State agencies and other interested persons, publish within one year of October 18, 1972, regulations, providing guidelines for effluent limitations, and, at least annually thereafter, revise, if appropriate, such regulations." The statute goes on to provide that "[s]uch regulations shall" conform to specific criteria. The requirement of a technology-based approach to promulgation and revision of regulations runs throughout the statutory text of § 304(b).

Section 304(b)(1)(A) states:

> Such regulations shall—identify . . . the degree of effluent reduction attainable through the application of the best practicable control technology currently available for classes and categories of point sources . . . .

CWA § 304(b)(1)(A).

Section 304(b)(1)(B) relates that the regulations "shall":

> specify factors to be taken into account . . . . relating to the assessment of best practicable control technology currently available . . . includ[ing] consideration of the total cost of application of technology in relation to the effluent reduction benefits to be achieved from such application, and shall also take into account the age of equipment and facilities involved, the process employed, the engineering aspects of the application of various types of control techniques . . . . and such other factors as the Administrator deems appropriate.[5]

---

[5]This last phrase, "and such other factors as the Administrator deems appropriate," indicates, as OCE acknowledges, that the EPA could adopt

CWA § 304(b)(1)(B).

Section 304(b)(2)(A) continues to mandate a technology-based approach, without differentiating between promulgation and revision:

> regulations shall . . . identify, . . . the degree of efflu-ent reduction attainable through the application of the best control measures and practices achievable including treatment techniques, process and proce-dure innovations . . . .

CWA § 304(b)(1)(A).

Section 304(b)(4)(A) yet again requires an analysis in terms of "application of the best conventional pollutant control tech-nology . . . ." Each of the subsections of § 304(b) includes a mandatory requirement related to technology.

**[7]** Under § 304(m), EPA also has an obligation to publish a biennial plan announcing a schedule for performing the annual review and for establishing rules regarding any exist-ing effluent guideline selected for possible revision as a con-sequence of the annual review. Section 304(m)(1) states in full:

> (m)  Schedule for review of Guidelines
>
>   (1)   Publication
>
>   Within 12 months after February 4, 1987, and biennially thereafter, the Administrator shall publish in the Federal Register a plan which shall—

---

additional factors for consideration, including harm or risk-based factors. The discretion to consider additional factors does not, however, render the mandatory factors optional.

(A)   establish a schedule for the annual review and revision of promulgated effluent guidelines, in accordance with subsection (b) of this section [specifying technology-based factors];

(B)   identify categories of sources discharging toxic or nonconventional pollutants for which guidelines under subsection (b)(2) of this section and section 1316 of this title have not previously been published; and

(C)   establish a schedule for promulgation of effluent guidelines for categories identified in subparagraph (B), under which promulgation of such guidelines shall be no later than 4 years after February 4, 1987, for categories identified in the first published plan or 3 years after the publication of the plan for categories identified in later published plans.

CWA § 304(m)(1).

In § 301, which deals with the five year review and revision of effluent limitations, Congress wrote: "Any effluent limitation required by paragraph (2) of subsection (b) of this section shall be reviewed at least every five years and, if appropriate, revised pursuant to the procedure established under such paragraph." CWA § 301(d). The cross-referenced subsection (b)(2) mandates the application of technology-based criteria in determining the applicable effluent limitations.

For example, § 301(b)(2)(A) states that effluent limitations for categories other than publicly-owned treatment works "shall require application of the best available technology economically achievable . . . ." The mandated technology-based criteria run throughout the text of § 301(b). *See, e.g.*, CWA § 301(b)(1)(A) ("[E]ffluent limitations . . . shall require the application of the best practicable control technology currently available . . . ."); § 301(b)(2)(E) ("[P]ollutants identi-

fied . . . shall require application of the best conventional pollutant control technology . . . .").

Under the first step of the *Chevron* analysis, the plain language of these provisions reflects that the CWA repeatedly mandates a technology-based approach as a non-discretionary matter in the promulgation of the regulations, at least as one methodology among others. Further, the statute makes clear that the regulations must comport with technological criteria that change over time, suggesting logically that review and revision must attend to such criteria as well in order for the regulations and limitations to remain in compliance with the mandatory and temporally changing criteria. The statutory language is unambiguous that *revision* decisions, although discretionary as indicated by the "if appropriate" language, are constrained by the statute's mandate as to what "such regulations" "shall" accomplish. The statute states that the regulations "shall" account for the technological factors without distinguishing between promulgation and revision.

**[8]** While the overall structure of the Act strongly counsels that any *review* to determine whether revision is appropriate must contemplate the mandatory technology-based factors, the statute does not expressly and unequivocally state as much. Therefore, we move to the second step of the *Chevron* analysis to consider whether EPA's position that the review need not abide by the same factors governing revision and promulgation is reasonable. Our review of the statute, its purpose, and its logical construction lead us to conclude that to the extent EPA argues that it may totally ignore technology as part of its annual review, EPA's position is unreasonable. To adopt EPA's position would require us to "ignore factors Congress required to be taken into account." *Earth Island*, 484 F.3d at 1131.

Although the dissent questions the invocation of the *Chevron* framework, we note that this approach gives the EPA the benefit of any ambiguity or doubt in analyzing these inter-

locking statutory provisions. Our charge, in any event, is to interpret the statute and determine whether there is a mandatory duty. As explained below, under traditional principles of statutory construction, the result is the same.

The statute all but explicitly states that the review is governed by the revision standards. Section 304(1)(A)—pertaining to the schedule for the annual *review* of the guidelines—cross-references § 304(b), which extensively delineates the *technology-based criteria*. Under § 304(m)(1)(A) the Administrator "shall" "establish a schedule for the annual review and revision of promulgated effluent guidelines, in accordance with subsection (b) of this section." Since § 304(m) itself references the timing of the reviews, the cross-reference to § 304(b) cannot relate solely to timing, unless the cross-reference is mere surplusage. Similarly, § 301(d), pertaining to review and revision of effluent limitations, cross-references § 301(b)(2), which in turn mandates various technological considerations. The rule against surplusage requires that we not regard Congressional acts as meaningless and the amendment of acts as "mere surplusage." *Natural Res. Def. Council, Inc. v. Train*, 545 F.2d 320, 325 (2d Cir. 1976); *see also Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1978) (stating that "[in] construing a statute we are obliged to give effect, if possible, to every word Congress used"). The only reasonable interpretation of the cross-referenced provisions is that they tie the review and revision to § 304(b) and § 301(b), respectively, both of which mandate a technology-based approach.

We next look at the common sense reading of the statute. The clear purpose of review and revision is to provide for continuing regulatory compliance with the statutorily-mandated and temporally changing criteria reflecting what the regulations and limitations "shall' accomplish. If the regulations and any revision must incorporate technology-based factors, how could EPA conduct a review to assess continuing compliance with the statutorily-mandated technology-based

requirements, while ignoring technology considerations altogether? For review to meaningfully determine whether revision is appropriate, such review must attend to the statutorily-mandated technology factors that provide for what the regulations are to accomplish. It makes no sense that Congress would require promulgation and revision tethered to technology-based requirements, but would somehow silently render discretionary the choice as to whether to review in light of the statutorily-required technological criteria. If the review is not also technology-based, the review could hardly inform the discretionary decision of whether revision is in fact appropriate, thus ignoring Congress' mandate as to what the regulations and limitations "shall" accomplish.   To be sure, the ultimate decisions in the review process are discretionary "as appropriate," but the foundational standard for review— the technology approach—is not optional.

In *Bennett v. Spear*, 520 U.S. 154 (1997), the Supreme Court highlighted the important distinction between a mandatory review process and an ultimately discretionary decision to take action following the review. 502 U.S. at 172. The Court considered a claim brought under the citizen suit provision of the Endangered Species Act (ESA), which, similar to CWA § 505(a), authorizes suits against the Secretary of Commerce or of the Interior "where there is alleged a failure of the Secretary to perform any act or duty under section 1533 of this title which is not discretionary with the Secretary." 16 U.S.C. § 1540(g)(1)(C). Petitioners alleged that the Secretary failed to abide by the statutory mandate to "tak[e] into consideration the economic impact, and any other relevant impact, of specifying any particular area as critical habitat." 520 U.S. at 172. The mandatory criteria to be considered by the Secretary under the ESA are followed by the statement that, except where the extinction of the species is at issue, "[t]he Secretary *may* exclude any area from critical habitat if he determines that the benefits of such exclusion outweigh the benefits of specifying such area as part of the critical habitat." *Id.* (quotation marks and citation omitted).

In *Bennett*, as here, the agency argued that judicial review was not available because the Secretary had "not failed to perform any nondiscretionary duty." in light of the discretionary nature of the ultimate decision at issue. *See* 520 U.S. at 171. Rejecting that analysis, the Supreme Court concluded that "the fact that the Secretary's ultimate decision is reviewable only for abuse of discretion does not alter the categorical *requirement* that, in arriving at his decision, he 'tak[e] into consideration the economic impact, and any other relevant impact,' and use 'the best scientific data available.' " 520 U.S. at 172 (citation omitted).

The challenge here mirrors that in *Bennet v. Spear*, in that OCE alleges a failure by EPA to consider particular statutorily-prescribed factors in making discretionary determinations. As the Court made plain in *Bennett*, "discretion as to the substance of the ultimate decision does not confer discretion to ignore the required procedures of decisionmaking." *Id*.

Significantly, our reading of the statute comports with EPA's own earlier interpretation of its review obligations. EPA stated in its 2003 Notice in the Federal Register that "[b]ecause CWA § 304(m)(1)(A) requires EPA to review promulgated guidelines in accordance with CWA section 304(b), EPA interprets the statute to authorize EPA to employ the same factors for its annual review that it would consider in selecting BAT in a rulemaking context. EPA believes that this is a reasonable approach because the outcome of EPA's annual review is a decision . . . identifying those effluent guidelines for possible revision." *See* Preliminary Effluent Guidelines Plan for 2004-2005, 68 Fed. Reg. 250, 75515 (EPA Dec. 31, 2003). Now, EPA disavows that § 304(m) links review procedures to revision and promulgation procedures. This inconsistency in EPA's position entitles its current interpretation to less deference. *See, e.g.*, *Mt. Graham Red Squirrel v. Madigan*, 954 F.2d 1441, 1457 (9th Cir. 1992) ("Given this fluctuation . . . we decline to rely on the Forest Service's 'expertise.' ").

**[9]** Finally, the legislative history supports reading the review provisions as mandating consideration of technology. In adopting the legislation, the Senate Committee on Public Works Conference Report recognized that the preexisting harm-based or water-quality approach was "limited in its success." S. Rep. No. 92-414, at 8 (1971), 1972 U.S.C.C.A.N. at 3675.

> Officials are still working to establish relationships between pollutants and water uses. . . . The Committee adopted this substantial change because of the great difficulty associated with establishing reliable and enforceable . . . limitations on the basis of a given stream quality . . . . The Committee recommends the change to effluent limits as the best available mechanism to control water pollution. With effluent limits, the Administrator can require the best control technology; he need not search for a precise link between pollution and water quality . . . . In order to carry out . . . this legislation, a two phase program . . . is created: the first based on best practicable technology, the second based on best available technology. In Phase I . . . all industrial pollution sources must apply the best practicable technology . . . . In Phase II . . . communities and industries will be required to apply, where the goal of no-discharge cannot be attained, the best available technology.

*Id*.

**[10]** The Committee report states that Congress intended the CWA to adopt a technology-based approach, not just with the initial regulations, but *over time* in multiple phases as technology continuously improved. Although we have not previously considered the particular question of EPA's review, in *Crown Simpson Pulp Co. v. Costle*, 642 F.2d 323, 327 (9th Cir. 1981), we acknowledged the technology-based requirements of the CWA: "We need not repeat here the

exhaustive discussions of the legislative history of the Act
. . . . These discussions demonstrate that a fundamental pur-
pose of the Act was to shift pollution control from a focus on
receiving water quality to a focus on the technological control
of effluent." If EPA dispenses with technology-based consid-
erations altogether in deciding whether to revise the effluent
limitations and guidelines, it will be unable to fulfill Con-
gress' mandate to tie effluent regulation to technological
improvements.

Despite the structure of the statute, EPA's earlier statement
that its reviews under § 304 are governed by the revision
criteria, and the Act's legislative history, EPA and the Inter-
venors argue that the technology-based approach provided for
in § 304(b) applied only to the *initial* promulgation of regula-
tions in 1972 and not to any subsequent review of those regu-
lations or limitations. EPA seizes on the language at the
beginning of § 304(b)—"the Administrator shall . . . publish
within one year of October 18, 1972, regulations, providing
guidelines for effluent limitations, and, at least annually there-
after, revise, if appropriate, such regulations"—and claims
that the mandatory language modifies only the promulgation
provision, not ongoing review for possible revision. Since the
mandate about what the regulations "shall" achieve does not
distinguish between promulgation, review and revision, the
plain language of the statute does not support EPA's position.
This argument is not only strained, but it makes no sense. In
short, this position is unreasonable.

As we noted earlier, many of the particular technological
criteria the regulations and limitations "shall" incorporate
under § 301(b) and § 304(b) are temporally changing rather
than fixed in time. For instance, the statute mandates that the
regulations "shall" "identify" "the degree of effluent reduc-
tion attainable through the application of the best practicable
control technology currently available" and "the degree of
effluent reduction attainable through the application of the
best control measure and practices achievable including treat-

ment techniques" and "process and procedure innovations." CWA § 304(b)(1)(A)-(4)(B). How can the regulations continue over time to identify the level of effluent reduction attainable through the best technology and procedure innovations currently available if EPA's review does not consider post-1972 technological advances at all? It strains credulity to the breaking point that Congress would provide in such great detail relevant temporally changing technological factors, and would then permit EPA to adopt regulations and limitations that would freeze in time the technology available in 1972 or even in the 1980s.

Finally, in support of its position that a technology-based approach is discretionary, EPA also points to *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 65-72 (2004), which held that a citizen suit under the APA cannot "seek wholesale improvement" of an agency "program by court decree." *Id.* at 64. We first note that OCE does not seek to "improve" EPA's review but simply to ensure compliance with objective criteria. The claim in *Norton* is also distinguishable from our case in a number of other respects. First, the statutory language in *Norton* was cast in discretionary and far broader terms than the language in the CWA. Whereas *Norton* concerned whether the Bureau of Land Management was managing wilderness areas in a manner "suitable" for preservation, OCE challenges the omission of specific statutorily-prescribed factors in EPA's reviews. Notably, in *Norton*, plaintiffs cited, in part, a *plan* rather than the statute itself as a source of the duty in question. Finally, the language in the plan took the form of "will" rather than "shall," which the Supreme Court found to lack the force of a binding commitment. *Id.* at 69. Here, as in *Bennett*, the statute mandates certain criteria that are to inform discretionary determinations as to the precise form of the regulations and effluent limitations. The overlying discretion does not render the mandated criteria discretionary.

**[11]** To the extent the EPA has completely abandoned a technology-based review in favor of a hazard-based review,

the Agency has breached its mandatory duties under §§ 301(d) and 304(b), (m). Although the EPA may determine in its exercise of discretion that no revision is appropriate, in conducting its review to reach that decision, the Agency must attend to the technology-based factors specifically prescribed by the CWA.

[12] Because the district court determined that EPA had no mandatory duty with respect to review requirements, the court did not consider whether EPA breached that duty. At this stage of the proceedings and on this record, however, it is not clear whether the EPA has in fact abandoned the mandatory technology-based approach altogether. While OCE claims that EPA has abandoned this duty, EPA counters that in fact it adopted a technology-based approach in addition to a harm-based approach.[6] Because this central dispute is unresolved, we remand to the district court for further proceedings.

## IV.  PUBLICATION SCHEDULE PROPOSED BY OCE

[13] Section 304(m) requires biennial publication of a plan for scheduling annual review and revision of the guidelines. The plan must provide for public review and comment prior to final publication. *See* CWA § 304(m)(2). OCE argues that the plan should be synchronized with the annual review, but as the district court correctly held, the Act does not require this degree of harmonization.

[14] The statute requires only that the EPA abide by the time limitations requiring biennial publication. Nowhere does the statute require that the EPA synchronize its publication

---

[6]For example, OCE claims that EPA has abandoned a technology-based review, citing EPA's own description of its annual review, which states, "EPA did not . . . conduct a comprehensive screening-level review of the availability of treatment or process technologies." EPA now disputes this characterization, claiming in its brief that "[i]n addition to conducting a hazard-based review, EPA also directly reviewed the availability of pollutant-reducing technologies for various industrial categories."

with the calendar year. OCE objects that use of the word "plan" implies that it be published before the described events take place. Although this argument has logical appeal, it is insufficient to trump the text of the statute, and the deference owed to the EPA under *Chevron*.

**[15]** As long as the EPA meets the statutorily-prescribed deadlines, and affords opportunity for notice and comment, it has satisfied its mandatory duties under § 304(m). The publication schedule preferred by OCE is not mandated by the statute, and thus is not amenable to challenge under § 505(a)(2).

## V.   IDENTIFICATION OF NEW POLLUTING SOURCES

OCE also argues that EPA has failed to identify new categories of industry discharging toxic and nonconventional pollutants not covered by existing effluent guidelines. The district court found that in 2005 EPA identified only two new sources for which no guidelines then existed. According to OCE, following EPA's 2003 review, EPA proposed not to schedule promulgation of any new effluent guidelines.

**[16]** Under § 304(m)(1)(B), the Administrator "shall" devise a plan which "shall—identify categories of sources discharging toxic or nonconventional pollutants for which guidelines under subsection (b)(2) of this section and section 1316 of this title have not previously been published." *Id*. The Administrator is also required to schedule publication of effluent guidelines for the categories identified under § 304(m)(1)(B). *See* CWA § 304(m)(1)(C).

**[17]** The statute does not require that the Administrator identify *all* or *any* existing categories of sources, only that the Administrator identify currently unregulated categories. The Senate Committee Report on the 1985 Amendments states: "Guidelines are required for any category of sources discharging significant amounts of toxic pollutants. In this use, 'significant amounts' does not require the Administrator to make

any determination of environmental harm; any non-trivial discharges from sources in a category must lead to effluent guidelines." S. Comm. on Env't & Pub. Works, 99th Cong., Report to Accompany S. 1128 (1985 Clean Water Act Amendments) 25 (Comm. Print 1985). The Senate Committee Report suggests that it is at least within the discretion of the Administrator to determine whether particular discharges are non-trivial, and hence require new effluent guidelines.

**[18]** Applying *Chevron* deference, we hold that the identification of new categories is a non-discretionary duty, but that the precise number and kind of such categories identified is discretionary with the Administrator. The statutory language and the legislative history do not command otherwise. Since EPA did identify two new categories of sources during the period in question here, OCE's challenge to the sufficiency of new source identification is not properly brought under § 505(a)(2).

## VI.   MOTION TO TRANSFER

After filing a notice of appeal to this court, OCE filed a motion to transfer its claims to this court as if they were originally filed here under § 509(b)(1). The district court did not abuse its discretion in refusing to transfer claims to this court after the notice of appeal had been filed. *See Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56, 58 (1982) (per curiam) (holding that once a notice of appeal is filed, the district court is divested of jurisdiction over the matter being appealed); *see also Miller v. Hambrick*, 905 F.2d 259, 262 (9th Cir. 1990) (a challenge to the district court's refusal to transfer claims under 28 U.S.C. § 1631 is reviewed for an abuse of discretion).

## CONCLUSION

On remand, the district court has jurisdiction to consider whether EPA is undertaking the mandated technology-based

review provided for under the Act. The district court properly dismissed OCE's claims regarding the scheduling of plan publication and identification of new polluting sources, and did not abuse its discretion in refusing to transfer OCE's claims to this court. The case is remanded for further proceedings to determine whether EPA has in fact breached its non-discretionary duties under §§ 301 and 304.

**REVERSED** and **REMANDED** for further proceedings as to the claims challenging EPA's alleged abandonment of a technology-based approach; **AFFIRMED** as to the plan publication claim, new sources claim, and refusal to transfer under 28 U.S.C. § 1631. Each party shall bear its own costs on appeal.

---

WALLACE, Senior Circuit Judge, concurring in part and dissenting in part:

I agree with the majority that the CWA does not unambiguously state that the EPA must conduct a technology-based review of its effluent guidelines. Because the CWA does not clearly mandate a particular method of review, I would hold that the district court properly refused to exercise jurisdiction.

Environmental advocates OCE brought suit under section 505(a)(2) of the CWA. This section provides jurisdiction in the district court for any claims alleging "a failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator." CWA § 505(a)(2). We have recognized that only "clear-cut" non-discretionary duties give rise to jurisdiction under this section. *See Farmers Union Cent. Exch., Inc.*, 881 F.2d 757, 760 (9th Cir. 1989). We have further emphasized that section 505(a)(2) was "intended to provide relief only in a narrowly-defined class of situations in which the Administrator failed to perform a mandatory function," and was not intended to "permit

the court to direct the manner in which any discretion given the Administrator in the performance of those functions should be exercised." *Kennecott Copper Corp. v. Costle*, 572 F.2d 1349, 1355 (9th Cir. 1978) (quoting *Wisconsin's Envtl. Decade, Inc. v. Wisconsin Power & Light Co.*, 395 F. Supp. 313, 321 (W.D. Wis. 1975).

I am not convinced that *Chevron* analysis is appropriate for this case. We are not trying to determine whether we should defer to the EPA's interpretation of the statute. We are merely trying to determine whether, objectively, the statute creates a mandatory duty, and whether plaintiffs could therefore challenge the EPA's failure to perform that duty in the district court. In other words, it is not a question of whether the *EPA* thinks the statute is mandatory, it is a question of whether we do. With the *Chevron* confusion eliminated, this becomes a relatively straightforward case.

It is undisputed that under the CWA, the EPA has an obligation to review periodically its effluent guidelines and limitations. It is further undisputed that the EPA has an obligation to utilize technology-based criteria when it exercises its discretion to *revise* the guidelines and limitations. Nothing in the CWA, however, specifically obligates the EPA to *review* the effluent guidelines and limitations using a technology-based approach. At most, the statutory provisions and legislative history are ambiguous. Because the CWA does not create a clear-cut, mandatory duty on the part of the EPA, I would affirm the district court's determination that it lacked jurisdiction under 505(a)(2).

I join the majority in holding that the district court properly dismissed OCE's remaining claims. I also join in holding that the district court did not abuse its discretion in refusing to transfer OCE's claims to this court.